10-419-cr
United States v. FNU LNU

**UNITED STATES COURT OF APPEALS**

**FOR THE SECOND CIRCUIT**

--------------

August Term, 2010

(Argued: March 22, 2011    Decided: August 9,  2011)

Docket No. 10-419-cr

--------------

UNITED STATES,

*Appellee,*

– v. –

FNU LNU, a/k/a SANDRA CALZADA,

*Defendant-Appellant.*

--------------

Before: JACOBS, *Chief Judge*, and CALABRESI and LOHIER, *Circuit Judges*.

Appeal of the defendant's conviction on immigration offenses after the district court (Weinstein, *J.*) denied her motion to suppress testimony from the officer who questioned her without *Miranda* warnings on her arrival at John F. Kennedy International Airport. Finding that, though for reasons different from those the district court gave, *Miranda* warnings were not required on the facts of this case, we AFFIRM.

Chief Judge Jacobs concurs in the judgment of the Court and files a separate opinion.

COLLEEN P. CASSIDY, *of counsel*, Federal Defenders of New York, Inc., Appeals Bureau, New York, N.Y., *for Defendant-Appellant.*

LAN NGUYEN, (Peter A. Norling, *on the brief*), Assistant U.S. Attorneys, *of counsel, for* Loretta Lynch, United States Attorney for the Eastern District of New York, Brooklyn, N.Y., *for Appellee.*

---

CALABRESI, *Circuit Judge*:

The district court (Weinstein, *J.*) denied the defendant's motion to suppress testimony from the Customs and Border Patrol (CBP) officer who questioned her without *Miranda* warnings on her arrival at John F. Kennedy International Airport. We reject the district court's reasoning that either a general exception to *Miranda* for border questioning exists or that the officer's intent in posing the questions is relevant. But, based on the totality of the circumstances, we conclude that the defendant was not in custody during the questioning and so *Miranda* warnings were unnecessary. Accordingly, we affirm the defendant's conviction.

## Background

The defendant, traveling under the name Sandra Calzada, arrived at John F. Kennedy International Airport in New York on December 29, 2008, on a flight from the Dominican Republic. In preparing to process the passengers from this flight, CBP Officer Frank Umowski ran the flight's manifest through a database of outstanding warrants and received notice that Calzada's name appeared on a New York Police Department (NYPD) arrest warrant. Umowski verified that the date and place of birth of the person on the warrant matched that listed on the passport for the passenger and flagged Calzada for "secondary inspection." Upon arrival, an armed guard escorted her to the secondary inspection room, which, Umowski concedes, she was not free to leave, and Umowski questioned her.

She presented a U.S. passport in the name of Sandra Calzada. He asked her: her name, her citizenship, and where and when she was born. She responded: Sandra Calzada, U.S. citizen, Puerto Rico, and gave a date of birth matching the passport. He asked if she had ever been arrested; she said no. He took her fingerprints, which failed to match those in the NYPD warrant. After a brief computer search, he found her 2008 passport application, which requested renewal of a 1998 passport, and determined that the application contained the same photograph and information as the passport the defendant presented. He then examined the 1998 application, which bore a photograph that he thought depicted someone else. Umowski confronted her with that older photograph, and she said she did not recognize the person pictured.

Umowski again questioned the defendant about her name and background, including her parents and siblings, this time using a translator. She responded that she had one brother, whereas the 1998 passport application listed only one sister. She was unable to recall any addresses where she had lived in Puerto Rico. In total, the questioning lasted for about 90 minutes. Umowski then delivered the defendant to another officer, to whom she gave a sworn statement.[1] CBP deemed her inadmissible at that time and held her over for a hearing with an immigration judge. At some later time, different federal agents arrested her on an indictment for making a false statement in a passport application, 18 U.S.C. § 1542; misusing a passport, *id.* § 1544; and aggravated identity theft, *id.* § 1028A(a)(1) & (c)(7).

In the district court, the defendant moved in limine to suppress her statements to Umowski, whom the government had slated as a trial witness, because he failed to provide her with the prophylactic warnings required by *Miranda v. Arizona*, 384 U.S. 436 (1966). The district

---

[1] The government never sought to admit this statement at trial.

3

court held a hearing and found *Miranda* inapplicable to this situation. It first held that *Miranda* warnings are not required where a person is questioned in a "routine border crossing inquiry." *United States v. FNU LNU*, No. 09-CR-415, 2009 U.S. Dist. LEXIS 88225, at **6 (E.D.N.Y. Sept. 25, 2009). It further explained that *Miranda* warnings were unnecessary because it believed Umowski's testimony that his "purpose . . . was to verify if [the defendant], in fact, was admissible into the U.S. as a U.S. citizen." *Id.* (internal quotation marks omitted). The court also explained that the interrogation constituted routine border questioning because "Umowski's function or intent" was only to determine the defendant's true identity. *Id.* It therefore denied the motion.

Umowski and the translator testified at trial. The government also presented testimony from the real Sandra Calzada, who testified that when she had been a cocaine addict, she had sold her passport, birth certificate, and social security card to her drug dealer. She had presented two different stories to the authorities before the one she told at trial and testified pursuant to a non-prosecution agreement covering her passport offenses, her cocaine offenses, and a more recent state shoplifting charge. A State Department agent, Eric Donelan, testified that the defendant possessed a receipt for the 2008 passport renewal and a social security card in the name Sandra Iris Calzada. He also testified that her boyfriend had brought the canceled 1998 passport, which bore her picture, to the airport after her detention and that her boyfriend had provided CBP with a birth certificate matching the information on both passports. Finally, the government called a Department of Homeland Security document expert, Wayne Laptosh, who testified that the 1998 passport had been altered.

The defendant presented no affirmative case, and the jury convicted her on all three counts. The district court sentenced her to 25 months' imprisonment, three years of supervised

4

release, and the mandatory special assessment. The defendant timely appealed, challenging only the district court's suppression decision.

## Discussion

This case presents the question of whether the district court correctly ruled that Officer Umowski's questioning failed to rise to the level of a "custodial interrogation" under *Miranda* and thus whether that court properly admitted into evidence the defendant's statements to Umowski. Though we generally review a district court's evidentiary decisions for abuse of discretion, *United States v. Quinones*, 511 F.3d 289, 307 (2d Cir. 2007), we review decisions on suppression motions de novo, *In re Terrorist Bombings of U.S. Embassies in E. Afr. v. Odeh*, 552 F.3d 157, 167 (2d Cir. 2008). We may, however, uphold the district court's ultimate decision on any ground supported in the record. *United States v. Green*, 595 F.3d 432, 436 (2d Cir. 2010).

An interaction between law enforcement officials and an individual generally triggers *Miranda*'s prophylactic warnings when the interaction becomes a "custodial interrogation." This determination has two parts: (a) there must be an interrogation of the defendant, and (b) it must be while she is in "custody." *See Cruz v. Miller*, 255 F.3d 77, 80–81 (2d. Cir. 2001) (recognizing custody and interrogation as separate elements of the *Miranda* determination); *accord United States v. Ali*, 68 F.3d 1468, 1473 (2d Cir. 1995). Neither the government nor the district court suggests that Umowski's direct questioning of the defendant fails to qualify as an interrogation. An interrogation consists of "express questioning or its functional equivalent," which aptly describes the interaction between Umowski and the defendant. *Rhode Island v. Innis*, 446 U.S. 291, 300–01

5

(1980).[2] Under standard *Miranda* analysis, the only issue in the instant case would be whether the defendant was in "custody" during the interrogation. The government, however, urges that an altogether different analysis should apply in the context of questioning at the border.[3] We take up this contention first.

Though accepting that *Miranda* applies when the questioning constitutes custodial interrogation, the government insists that "[r]outine border questioning does not constitute 'custodial interrogation' for *Miranda* purposes." Appellee's Br. 17. Indeed, it claims there exists a "routine border questioning exception to *Miranda*," dating back several decades and undisturbed by developments in Fifth Amendment law. *Id.* at 20. This exception stems, it asserts, from the government's "broad powers to detain, search, and question individuals even absent any reasonable suspicion of wrongdoing" at "border entry points." *Id.* at 16. In support of this argument, the government relies primarily on three cases: *Tabbaa v. Chertoff*, 509 F.3d 89 (2d Cir. 2007), *United States v. Silva*, 715 F.2d 43 (2d Cir. 1983), and *United States v. Rodriguez*, 356 F.3d 254 (2d Cir. 2004). We address each case in turn.

Relying on *Tabbaa*, the government contends that border questioning requires *Miranda* warnings only when it becomes "non-routine." *Tabbaa* rejected a Fourth Amendment challenge to

---

[2] An exception exists for "routine booking question[s]," but aside from the fact that Umowski was not booking the defendant during the questioning here, the questions asked far exceeded the scope of that exception. *Pennsylvania v. Muniz*, 496 U.S. 582, 601–02 (1990) (establishing the exception for questions about the suspect's "name, address, height, weight, eye color, date of birth, and current age").

[3] The international arrivals section and Customs area of a U.S. airport undisputedly constitute the "border" for constitutional purposes. *See Almeida-Sanchez v. United States*, 413 U.S. 266, 273 (1973) ("[A] search of the passengers and cargo of an airplane arriving at a [U.S.] airport after a nonstop flight from [abroad] would clearly be the functional equivalent of a border search."); *United States v. Irving*, 452 F.3d 110, 123 (2d Cir. 2006) ("An airport is considered the functional equivalent of a border and thus a search there may fit within the border search exception.").

a series of border searches involving pat downs, fingerprinting, photographing, and questioning lasting several hours. 509 F.3d at 94–95, 100–01. Under Fourth Amendment case law, routine border searches fall within a well-established exception to the warrant requirement. The term "routine" delineates the exception's scope, thus explaining the term's significance in this line of jurisprudence. *See, e.g., United States v. Montoya de Hernandez*, 473 U.S. 531, 538 (1985) ("Routine searches of the persons and effects of entrants are not subject to any requirement of reasonable suspicion, probable cause, or warrant . . . ."); *United States v. Martinez-Fuerte*, 428 U.S. 543, 566 (1976) (authorizing warrantless, suspicionless stops for "brief questioning routinely conducted at permanent checkpoints" near the border).

But Supreme Court precedents establish no similar exception to *Miranda*'s prophylactic requirement under the Fifth Amendment. *Cf. Pennsylvania v. Muniz*, 496 U.S. 582, 601–02 (1990) (adopting an exception to *Miranda* for "routine booking question[s]"); *New York v. Quarles*, 467 U.S. 649, 657–58 (1984) (recognizing a limited public-safety exception to *Miranda*); *Harris v. New York*, 401 U.S. 222, 224–26 (1971) (holding that statements that were otherwise inadmissible due to a *Miranda* violation were admissible to impeach the defendant's trial testimony).

Similarly, *Tabbaa* says nothing about *Miranda* or the Fifth Amendment, and, indeed, as we have previously said, "whether a 'stop' was permissible under [Fourth Amendment doctrine] is irrelevant to the *Miranda* analysis." *Ali*, 68 F.3d at 1473. Though *Tabbaa* provides a useful guide for delineating the boundaries of "routineness" as that word is used in the specific context of Fourth Amendment warrantless border searches, its usefulness outside that context is inherently limited. *United States v. Irving*, 452 F.3d 110, 123 (2d Cir. 2006) (discussing the "routine"-border-

7

search exception to the Fourth Amendment and noting that "the level of intrusion into a person's privacy is what determines whether a border search is routine"). *Tabbaa* does not speak to the primary question we face here: does a border-questioning exception to the requirement of *Miranda* warnings—whether limited by routineness or not—exist at all. Accordingly, *Tabbaa* is of little help to the government here.

The government argues, however, that *Silva* establishes just such a border-questioning exception for our circuit. It is *Silva*, also, that forms the core of the district court's decision admitting the evidence in this case. In *Silva*, the defendant was convicted of making a false statement to a federal official and of attempting to bring a large sum of currency into the country without declaring it. 715 F.2d at 44. After initial questioning at the Canadian border during which the defendant claimed to be a U.S. citizen, an immigration agent searched her purse, in which he found her Venezuelan passport and a bundle of currency. *Id.* at 45–46. Customs officials then asked her additional questions about the currency, which led to establishing her criminal conduct.[4] *Id.* Noting that the questioning "amounted to no more than routine customs and immigration inquires," we held that the officers' un-Mirandized questioning of the defendant at the border was permissible. *Id.* at 46. Critically, in so holding, we rejected the defendant's argument that she was entitled to *Miranda* warnings as soon as any agent had probable cause to arrest her, that is, as soon as they discovered her Venezuelan passport after she had claimed to be a U.S. citizen. *Id.* at 47.

---

[4] The law governing undeclared importation of currency applies only over a given threshold. *See* 31 U.S.C. § 5322 (providing criminal penalties for willful violation of 31 U.S.C. §§ 5311–32); 31 U.S.C. § 5316 (1984) (prohibiting the undeclared importation of more than $5,000 in U.S. currency) (amended by Pub. L. 99-570, § 1358(c) (increasing the threshold to $10,000)). Until agents questioned her and counted the currency, whether the defendant possessed more than that threshold was unclear.

To reach this conclusion, we distinguished a prior case, *United States v. Moody*, 649 F.2d 124 (2d Cir. 1981), in which we had held that customs agents erred in failing to give *Miranda* warnings to a suspect once they saw her carrying what appeared to be drugs—that is, at the moment probable cause arose for her arrest. Her response "was elicited for the purpose of incriminating her" and *Miranda* applied. *Id.* at 128.

The *Silva* court reasoned in two steps. First, it separated the fact that immigration agents had probable cause to arrest the defendant on the false statement offense—as to which no challenged questions had been posed—from the issue of whether customs agents had probable cause to suspect a crime with respect to the currency. *Silva*, 715 F.2d at 48. Then, it found that the customs agents acted properly in questioning her about the currency because transporting currency—unlike transporting drugs, as in *Moody*—is not inherently illegal and, therefore, creates no automatic suspicion of criminal wrongdoing. *Id.* In all this, the court continued to focus on whether the agents thought they had probable cause to believe a crime was being committed as the key to determining whether the situation consisted of "routine customs and immigration inquiries." *Id.* at 46. Because the inquiries were routine, it concluded, *Miranda* warnings were not required.

On appeal, as she did also below, the defendant argues that reliance on *Silva* is misplaced because a series of later Supreme Court cases, most notably *Berkemer v. McCarty*, 468 U.S. 420 (1984), and *Stansbury v. California*, 511 U.S. 318 (1994), have undercut its bases and, therefore, its current validity. *Berkemer* involved a traffic stop during which the officer elicited incriminating statements from the suspect. In concluding that the traffic stop, though a seizure, failed to

9

implicate the coercive aspects of stationhouse interrogation that animated *Miranda*, and thus failed to constitute custody, the Court rejected the contention that the officer's "unarticulated plan" to arrest the suspect had any bearing on the determination of custody. 468 U.S. at 442. The motive of the questioner was thus deemed irrelevant.[5] Similarly, in *Stansbury*, a man considered a witness rather than a suspect accompanied police to their stationhouse for questioning. During the course of that questioning, police began to suspect him of having committed the crime, ceased the interview, and read him the *Miranda* warnings. At trial he moved to suppress his pre-warning statements. The trial court denied the motion and the California Supreme Court affirmed, reasoning that the interrogation became custodial only when suspicion focused on the defendant. 511 U.S. at 320–22. The Court remanded the case for reconsideration, explicitly stating more than once that the officer's subjective beliefs about whether the interviewee was a suspect were irrelevant to the *Miranda* determination. *Id.* at 323–26.

Together, these and subsequent Supreme Court cases establish that the test for when *Miranda* warnings are mandated is objective with respect to the personal attitudes and knowledge of both the questioner and the person questioned. It depends on how a *reasonable person* in the suspect's position would view the situation. *See, e.g., Stansbury*, 511 U.S. at 323 ("Our decisions make clear that the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the

---

[5] The *Berkemer* court also considered a test based only on the existence of probable cause. 468 U.S. at 435 n.22. The Court rejected probable cause as the dividing line because probable cause rests, in part, on what the officer knows but the suspect may not, making it subjective, and because "[t]he threat to a citizen's Fifth Amendment rights that *Miranda* was designed to neutralize has little to do with the strength of an interrogating officer's suspicions."

person being questioned.").[6] To the extent that *Silva* and *Moody* rely on the officer's subjective motives for the interrogation (including the uncommunicated existence of probable cause or intent to arrest) in determining whether the interaction qualifies as custodial, we agree with the defendant that *Berkemer* and *Stansbury* abrogate them. This does not mean, however, that *Silva* does not remain important and, indeed, binding on us in some particulars that do not depend on its reliance on the subjective intent of the questioner. Specifically, *Silva*'s holding with respect to the (a) routineness of the (b) questioning (c) at the border, remains our circuit law and distinguishes our approach from both the Third Circuit in *United States v. Kiam*, 432 F.3d 524 (3d Cir. 2006), and the First Circuit in *United States v. Ventura*, 85 F.3d 708, 711 (1st Cir. 1996), discussed *infra*.

*Rodriguez*, the final case on which the government's relies, has little bearing on this case. There the defendant, while incarcerated on unrelated state charges, submitted to an interview with a federal immigration officer. No *Miranda* warnings were given. The defendant's responses during that interview established that his presence in the United States was unauthorized and, on his release from state custody, the federal government deported him. A year later, he returned to the United States and was arrested at the airport while attempting to enter the country illegally. At his trial for unauthorized reentry and visa fraud, the immigration agent testified regarding the defendant's nationality, based on the then-four-year-old interview. 356 F.3d at 256–57. The trial court denied the defendant's motion to suppress this evidence pursuant to *Miranda*, and we affirmed.

---

[6] Fourth Amendment doctrine, which uses a similar reasonable-person test, holds that the relevant perspective is that of a reasonable, *innocent* person. *Florida v. Bostick*, 501 U.S. 429, 438 (1991) (rejecting the argument that a suspect's consent to search his luggage must be invalid because no reasonable person in his actual shoes—who knows the luggage contains contraband—would consent). Whether the reasonable person in the Fifth Amendment *Miranda* inquiry is similarly innocent seems to be an open question.

To begin with, the *Rodriguez* court's precise holding evades easy discernment. In *Rodriguez*, we found both (a) that Rodriguez's interrogation did not require a *Miranda* warning and (b) that sufficient other evidence existed to render harmless any error in admitting the agent's testimony. *Id.* at 260–61. Furthermore, we have generally treated the issue of whether questioning requires *Miranda* warnings differently depending on whether the suspect was already incarcerated on unrelated grounds at the time of the interrogation. *See, e.g.*, *United States v. Willoughby*, 860 F.2d 15, 23 (2d Cir. 1988) (holding that though the defendant's incarceration was undeniably custody in the colloquial sense, the conversation at issue involved no additional coercion and so *Miranda* warnings were not required). Therefore, because Rodriguez was incarcerated during his questioning, how that court analyzed whether *Miranda* warnings were required is not directly apposite to whether they were required in the instant case, where the defendant was not in prison.

Most important, moreover, in reaching its conclusion that Rodriguez's interrogation was not custodial, the court distinguished a seemingly similar Supreme Court case that had excluded the evidence, *Mathis v. United States*, 391 U.S. 1 (1968). *Mathis*, the court noted, involved administrative questioning in an ongoing investigation into the crime for which the defendant was ultimately prosecuted, whereas the crime for which Rodriguez was prosecuted—illegally reentering the country after being deported—had yet to occur when Rodriguez's interview with the INS agent took place. *Rodriguez*, 356 F.3d at 260. Clearly, the instant case lies closer to *Mathis* than to *Rodriguez* in this regard: for here, as in *Mathis*, Umowski's questioning of the defendant focused on precisely the set of facts underlying the conviction she now appeals.[7]

---

[7] The government also seeks to base *Rodriguez* on an earlier circuit decision that *Rodriguez* quotes as asking whether the "'officers . . . are aware of the potentially incriminatory nature of the disclosures sought.'" *Rodriguez,* 356 F.3d at 259 (quoting *United States v. Morales*, 834 F.2d 35, 38 (2d Cir. 1987)). But,

We, therefore, conclude (a) that the government's position is not supported by binding precedent in this circuit, but (b) that *Silva* continues to guide our approach to the case before us.

The question thus becomes: was the defendant in the case before us in "custody" during the questioning. The district court—believing that it was bound by *Silva*'s reliance on the questioner's intent—admitted the evidence without reaching the issue of custody. *See FNU LNU*, 2009 U.S. Dist. LEXIS 88225, at **6–7. In such circumstances, we would normally remand the case to the district court to determine, in the first instance, whether custody existed. *See Ali*, 68 F.3d at 1473. Here, however, the district court admirably compiled an extensive record documenting the circumstances of the defendant's questioning. As a result, we are at no disadvantage in examining the issue first. Given, moreover, that we would review the district court's custody conclusion de novo in any event, *United States v. Badmus*, 325 F.3d 133, 138 (2d Cir. 2003) (per curiam), considerations of judicial efficiency lead us to resolve the case ourselves.

We pause to clarify that "custody" for Miranda purposes is not coterminous with, though it is often informed by, the colloquial understanding of custody. For example, in *Berkemer*, even though state law required the defendant to stop when the highway patrolman flashed his lights and the defendant was not free to leave the traffic stop, either as a legal matter or in terms of how a reasonable person would view the situation, the stop did not constitute "custody" for *Miranda* purposes. 468 U.S. at 435–39; *see also Willoughby*, 860 F.2d at 23 (holding that incarceration does not necessarily constitute *Miranda* "custody"). As stated by the Supreme Court and our cases, the overarching "custody" question is whether "a reasonable [person] in the suspect's position would

significantly, *Morales*, and hence this aspect of *Rodriguez*, preceded *Stansbury* and its rejection of subjective intent. The basis of *Rodriguez* noted above—the time of the interview in relation to the crime charged—is, instead, completely consistent with the Supreme Court's requirement of an objective *Miranda* test.

13

have understood" herself to be "'subjected to restraints comparable to those associated with a formal arrest.'" *Georgison v. Donelli*, 588 F.3d 145, 155 (2d Cir. 2009) (quoting *Berkemer*, 468 U.S. at 441)).

Imagining oneself in "the suspect's position" necessarily involves considering the circumstances surrounding the encounter with authorities. Those circumstances include, inter alia, the interrogation's duration; its location (e.g., at the suspect's home, in public, in a police station, or at the border); whether the suspect volunteered for the interview; whether the officers used restraints; whether weapons were present and especially whether they were drawn; whether officers told the suspect he was free to leave or under suspicion, *see Yarborough v. Alvarado*, 541 U.S. 652, 661–63, 664–65 (2004) (recounting the development of *Miranda* case law); and, now, a juvenile suspect's age, if known to the officer or readily apparent, *J.D.B. v. North Carolina*, 131 S. Ct. 2394, 2406 (2011). *See also Ali*, 68 F.3d at 1472–73 (looking at the "'objective circumstances of the interrogation'" such as its location out of public view, the fact that officers drew weapons and surrounded the defendant, and the fact that they confiscated his travel documents, without which he could not leave (quoting *Stansbury*, 54 U.S. at 322)). The circumstances also include, and especially so in border situations, the nature of the questions asked. *See United States v. Galloway*, 316 F.3d 624, 631 (6th Cir. 2003) (considering the content of the CBP officer's questioning in evaluating whether custody existed in an airport).

A reasonable person's expectations about how the questioning is likely to unfold are also relevant. Again, in *Berkemer*, the Court explained that "[a] motorist's expectations, when he sees a policeman's light flashing behind him, are that he will be obliged to spend a short period of time

14

answering questions and waiting while the officer checks his license and registration, that he may then be given a citation, but that in the end he most likely will be allowed to continue on his way." 468 U.S. at 437. Because one expects the detention to be brief and the questioning to be circumscribed and related to the driver's identification, authorization to drive, and conduct on the roadway, one need not fear the coercion present in stationhouse interrogations that prompted *Miranda*, in which "questioning will continue until [the suspect] provides his interrogators the answers they seek." *Id.* at 438.

Similarly, in the context of arriving at an American airport, (a) in which compulsory questioning—with no freedom to enter the United States and with nowhere else to go—inheres in the situation and (b) in which the traveler has voluntarily submitted to some degree of confinement and restraint by approaching the border, a reasonable traveler will expect some constraints as well as questions and follow-up about his or her citizenship, authorization to enter the country, destination, baggage, and so on. That one expects both constraints and questions—and that, at least initially, every traveler in the airport must submit to the same sort of questioning while not free to leave—reduces the likelihood that reasonable persons in that situation would consider themselves to be under arrest.

Moreover, because the questions asked are, by definition, communicated to the suspect—unlike the officer's subjective intent to arrest the suspect or the existence of probable cause—they are a proper part of the objective *Miranda* inquiry. *Cf. Stansbury*, 511 U.S. at 323. In the context of both the roadside traffic stop and the border, the content of the officer's questions substantially inform whether a reasonable person would feel restrained in a way similar to a formal arrest. Indeed, in many such cases, the fact that the questions asked fall within the range of

15

inquiries one expects will, by itself, be enough to assure a reasonable person that he or she is not under arrest.

This is not to say, however, that the nature of the questions asked is the only relevant factor. *Cf. Kiam*, 432 F.3d at 528–29 (adopting a border-questioning exception to *Miranda* and rejecting the need for any inquiry into the conditions of the interrogation as well as—in contradistinction to *Silva*—any distinction between "routine" and "non-routine" questioning); *Ventura*, 85 F.3d at 711 (noting the importance of the questions asked but seemingly not giving that factor the priority we did in *Silva*). To look only at any single factor would be inconsistent with *Miranda*'s role as a protection against coercion. The rule exists to temper the "potentiality for compulsion" that exists when an individual is "cut off from the outside world" and subjected to "incommunicado interrogation . . . in a police-dominated atmosphere." *Miranda*, 384 U.S. at 457, 445. That potential comes from the "inherently coercive pressures that tend to undermine the individual's will to resist and to compel him to speak" in such an environment. *United States v. Morales*, 834 F.2d 35, 38 (2d Cir. 1987). *Silva*, with its emphasis on what is normally asked at the border, suggests that it is possible, though unlikely, for such an environment to exist even at the border, and if it does, so, too, must *Miranda*'s protections.

As in the traffic-stop context, the inquiry remains a holistic one in which the nature and context of the questions asked, together with the nature and degree of restraints placed on the person questioned, are relevant. *Berkemer*, 468 U.S. at 441 n.34 (contrasting the facts of Berkemer's traffic stop with those in *Commonwealth v. Meyer*, 488 Pa. 297, 301 (1980), which found a traffic stop that lasted more than 30 minutes "custodial"). This holding comports with

16

those in several of our sister circuits that *Miranda* warnings might be required even at the border if the interrogation occurs while the defendant is "handcuffed to a bench in a locked security office . . . for . . . four hours," *United States v. RRA-A*, 229 F.3d 737, 741 (9th Cir. 2000), "placed in a locked cell," *United States v. Butler*, 249 F.3d 1094, 1100 (9th Cir. 2001), or "physically . . . restrained" while officers had weapons drawn, *see United States v. Moya*, 74 F.3d 1117, 1119 (11th Cir. 1996). But we need not decide today where any such lines would be drawn; that is, we need not speculate on the appropriate outcome in cases in which *Kiam* and *Ventura* might lead to different results. This case does not ultimately turn on that.

Several facts about the interrogation of the defendant before us militate in favor of finding it "custodial": it took place in a closed room, out of public view; armed guards escorted the defendant there and remained in the vicinity; it lasted for 90 minutes, substantially longer than most interviews that we have deemed non-custodial in other contexts, *see, e.g.*, *Cruz*, 255 F.3d at 81–86 (contrasting "brief," noncustodial questioning with a traffic stop that lasted more than 30 minutes and was custodial); Umowski took the defendant's fingerprints and did not inform her she was free to go. She was not, in fact, free to go. On the other hand: the officers never drew their weapons; no physical restraints were used; and, crucially, a reasonable person would recognize all Umowski's questions as relevant to her admissibility to the United States. Such a person would consider them par for the course of entering the country from abroad.

In light of the totality of these circumstances, we conclude that a reasonable person in the defendant's position would not have considered what occurred to be the equivalent of a formal arrest. It follows that the defendant was not in "custody" and that, for this reason alone, *Miranda*

17

warnings were not required. Accordingly, the district court correctly denied the motion to suppress Umowski's testimony.

## Conclusion

We hereby AFFIRM the defendant's conviction.

DENNIS JACOBS, <u>Chief Judge</u>, concurring:

I concur in the result.

## I.

I am unable to sign the majority opinion for several reasons. First, the case of First-Name-Unknown Last-Name-Unknown ("FNU LNU") is the easiest of cases, in which the questions asked of her had bearing on the most routine issues of identity: her name, where she was born, her country of citizenship, the contact information of her friends and family, details about the city in Puerto Rico where she purported to live for over thirty years, etc. Moreover, the location and circumstances of her confinement were unremarkable.

After the 90-minute interview, the Customs and Border Patrol officers were unable even to ascertain FNU LNU's name. Indeed, if she was subjected to questioning at the airport until her name *was* known, she would be there still. So if she was being questioned (and detained) for 90 minutes, it is only because she declined to say who she is.

19

This case therefore does not remotely present the occasion for a _tour_ _d'horizon_ of <u>Miranda</u> law, or for pages of tendentious analysis in which useful precedents of this Circuit are deconstructed. <u>See</u> Majority Op. at 7-13.

This case is important nonetheless because muddling up <u>Miranda</u> law in the context of questioning entrants at the border is very dangerous. The majority opinion unnecessarily complicates what should be a straightforward holding. Point II of this concurrence abstracts the holding from the surrounding commentary and <u>dicta</u> in the majority opinion. I do so for the benefit of future parties and panels of this Court.

## II.

Our holding in <u>United States v. Silva</u>, 715 F.2d 43 (2d Cir. 1983) was abrogated by both <u>Berkemer v. McCarty</u>, 468 U.S. 420 (1984) and <u>Stansbury v. California</u>, 511 U.S. 318 (1994) to the _limited_ extent that the subjective intentions of an officer should not be considered in the <u>Miranda</u> analysis. Otherwise, <u>Silva</u> remains the law of this Circuit and guides our analysis here.

20

Silva: (1) rejected the proposition that "from the moment [the entrant] was directed to the secondary inspection area she was in a custodial environment," 715 F.2d at 46 (internal quotation marks omitted); reiterated that "Miranda warnings need not be given to one detained at the border and subjected to a routine customs inquiry," id.; and observed that "questions . . . necessary to enforce immigration and customs regulations" generally will not require Miranda warnings, id. at 47. Unlike the Third Circuit in United States v. Kiam, 432 F.3d 524, 530 (3d Cir. 2006), however, Silva refrained from adopting a bright-line exception to Miranda at the border and instead recognized Miranda's limited application to non-routine customs inquiries. See Silva, 715 F.2d at 46-47.

Practically speaking, the *most* important factor in determining whether Miranda applies at our borders will often be the objective function of an inspector's questions, not the custodial nature of the questioning.

Miranda warnings are not required in a routine secondary inspection when, as in this case, a reasonable person would consider the questions asked (e.g., name,

21

country of birth, citizenship, etc.) to be relevant to an admissibility or customs determination.  True, some events or factors might tip the balance in *another* case.  When the custodial conditions become clearly exceptional rather than routine--handcuffs, drawn weapons, administration of Sodium Pentothal, etc.--questions that objectively bear on admissibility *might* require a <u>Miranda</u> warning.  Those circumstances, however, are not present here and remain to be decided in future cases.

The views expressed in this Point are common ground among the panel members, and are expressed without fear of contradiction.