12-333-cr(L)
United States v. Yilmaz

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

## SUMMARY ORDER

RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A
SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS
GOVERNED BY THIS COURT'S LOCAL RULE 32.1.1 AND FEDERAL RULE OF APPELLATE
PROCEDURE 32.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS
COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC
DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING A SUMMARY
ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.

At a stated Term of the United States Court of Appeals for the Second
Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square,
in the City of New York, on the 25th day of January, two thousand thirteen.

Present:     SUSAN L. CARNEY,
             CHRISTOPHER F. DRONEY,
                  *Circuit Judges*,
             PAUL G. GARDEPHE,
                  *District Judge.*[*]

---

| |
|---|---|
| UNITED STATES OF AMERICA, | |
| *Appellee*, | |
| v. | Nos. 12-333-cr(L), |
| | 12-344-cr(CON) |
| EFRAHIM YILMAZ, | |
| *Defendant-Appellant.* | |

---

Appearing for Appellant:     PAUL S. VOLK, Blodgett, Watts, Volk & Sussman,
                             P.C., Burlington, VT.

Appearing for Appellee:      PAUL SILVER (Elizabeth S. Riker, Edward P.
                             Grogan, *on the brief*) Assistant United States
                             Attorneys, *for* Richard S. Hartunian, United States
                             Attorney for the Northern District of New York.

---

[*] The Honorable Paul G. Gardephe, United States District Judge for the Southern District of
New York, sitting by designation.

Appeal from the United States District Court for the Northern District of New York (Lawrence E. Kahn, *Judge*).  **ON CONSIDERATION WHEREOF,** it is hereby **ORDERED, ADJUDGED,** and **DECREED** that the judgment of the District Court be and it hereby is **AFFIRMED**.

Defendant-Appellant Efrahim Yilmaz appeals from a conviction of one count of attempting to transport an alien within the United States in violation of 8 U.S.C. § 1324(a)(1)(A)(ii).  This proceeding follows Yilmaz's conditional guilty plea, in which he reserved his right to appeal the denial of his suppression motion.  We assume the parties' familiarity with the underlying facts, the procedural history, and the issues on appeal, to which we refer only as necessary to explain our decision.

Yilmaz's conviction arises from his attempt to enter the United States from Canada by vehicle, driving through the Port of Entry in Champlain, New York. During that attempt, Yilmaz, a Turkish citizen and legal permanent resident of the United States, was subject to both a "primary inspection" and a "secondary inspection" conducted by Customs and Border Protection ("CBP") officers.  During the latter inspection, those officers found evidence in Yilmaz's vehicle leading them to suspect him of involvement in alien smuggling.  When that suspicion arose, they terminated the inspection, contacted the Immigration and Customs Enforcement ("ICE") agent on duty, and moved Yilmaz to a detention cell.  Several hours later, the ICE agent read Yilmaz his <u>Miranda</u> rights, and Yilmaz signed a written waiver

of those rights.  The ICE agent then interviewed Yilmaz, who made certain incriminating statements.

In proceedings before the District Court, Yilmaz moved to suppress evidence and statements gleaned as a result of his encounters with CBP and ICE at the Champlain Port of Entry.  After the District Court denied the motion, Yilmaz conditionally pled guilty to one count of attempting to transport an alien within the United States in violation of 8 U.S.C. § 1324(a)(1)(A)(ii).

On appeal, Yilmaz makes two arguments related to his motion to suppress. First, he contends that during the primary and secondary inspections, he was "in custody" of CBP officers for purposes of Miranda v. Arizona, 384 U.S. 436 (1966), and because the officers failed to advise him of his Miranda rights, any statements he made during the inspections, as well as any evidence obtained as a result of those statements, must be suppressed.  Second, he contends that he has a limited understanding of English, making his post-inspection Miranda waiver neither knowing nor voluntary, and for this reason any statements he made following the waiver, as well as any evidence obtained as a result of those statements, must be suppressed.

On appeal from the denial of a motion to suppress, we review the district court's conclusions of law *de novo* and its factual findings for clear error, viewing the evidence in the light most favorable to the government.  United States v. Rodriguez, 356 F.3d 254, 257-58 (2d Cir. 2004).  A factual finding is clearly erroneous "only when the reviewing court on the entire evidence is left with the

3

definite and firm conviction that a mistake has been committed." United States v. Oehne, 698 F.3d 119, 121 (2d Cir. 2012) (per curiam) (internal quotation marks omitted).

### A.    Yilmaz's Primary and Secondary Inspections

"An interaction between law enforcement officials and an individual generally triggers Miranda's prophylactic warnings when the interaction becomes a 'custodial interrogation.'" United States v. FNU LNU, 653 F.3d 144, 148 (2d Cir. 2011).  The "overarching 'custody' question is whether a reasonable person in the suspect's position would have understood herself to be subjected to restraints comparable to those associated with a formal arrest." Id. at 153 (internal quotation marks and alteration omitted).  In determining whether a suspect is "in custody" for Miranda purposes, we consider, among other factors, the duration and location of the interrogation, the nature of the questions asked, whether the defendant volunteered for the interrogation, whether the officers used restraints, whether weapons were present or drawn, and whether the officers told the suspect he was free to leave or under suspicion. Id.  "Practically speaking, the *most* important factor in determining whether Miranda applies at our borders will often be the objective function of an inspector's questions . . . ." Id. at 156 (Jacobs, C.J., concurring).

We agree with the District Court that Yilmaz was not "in custody" for Miranda purposes during the primary inspection.  That inspection was brief and took place while Yilmaz remained in his vehicle at a highway border crossing – a

4

location where a reasonable person "will expect some constraints as well as questions." Id. at 153 (majority opinion). In addition, the questions then asked of Yilmaz were routine and relevant to his admissibility and the admissibility of his effects. For example, Yilmaz was asked where he lived, where he was coming from, how long he had spent in Canada, the purpose of his trip, his occupation, whether he had any goods to declare, and for the name of the owner of his vehicle. A reasonable person in Yilmaz's position would not have understood himself subject to the equivalent of a formal arrest during this inspection.

We also agree with the District Court that Yilmaz was not "in custody" during the secondary inspection. Although the secondary inspection lasted for approximately ninety minutes and Yilmaz was not free to leave, during that time Yilmaz remained unrestrained in an area of the Port of Entry described as a "waiting room." As before, the questions asked of Yilmaz during the secondary inspection were routine and relevant to his admissibility and the admissibility of his effects. Yilmaz was asked to (and did) fill out a standard customs declaration form. He was also asked about the purpose of his trip, how he had entered Canada, his plans for the vehicle once he entered the United States, and the reason for his possession of several thousand dollars in United States currency. Thereafter, a CBP officer inspected Yilmaz's vehicle while Yilmaz remained in the waiting room. While the secondary inspection was undoubtedly more thorough than the primary inspection, the objective function of the officers' inquiries concerned admissibility, and a reasonable person in Yilmaz's position "would not have considered what

5

occurred to be the equivalent of a formal arrest." FNU LNU, 653 F.3d at 155. Rather, a reasonable person would consider the secondary inspection "par for the course of entering the country from abroad." Id.

Because Yilmaz was not "in custody" during either his primary or his secondary inspections, Miranda warnings were not required before or during either of those inspections, and their absence does not provide a basis for suppression. Id.

## B.     The Validity of Yilmaz's Miranda Waiver

To prove a valid waiver of Miranda rights, the government must show "(1) that the relinquishment of the defendant's rights was voluntary, and (2) that the defendant had a full awareness of the right[s] being waived and of the consequences of waiving th[ose] right[s]." United States v. Jaswal, 47 F.3d 539, 542 (2d Cir. 1995) (per curiam). In determining whether a defendant's waiver was valid, we ask whether "the totality of the circumstances reveals both an uncoerced choice and the requisite level of comprehension." United States v. Male Juvenile (95-CR-1074), 121 F.3d 34, 40 (2d Cir. 1997) (internal quotation marks omitted).

Yilmaz argues that the District Court clearly erred in concluding that he knowingly waived his Miranda rights because, according to Yilmaz, his allegedly "limited ability to understand English" rendered him unable to understand those rights. Appellant's Br. at 22. We are not persuaded. The CBP officer who conducted Yilmaz's primary inspection testified that Yilmaz spoke only English during the inspection, that Yilmaz had no difficulty answering questions, and that Yilmaz never stated that he could not understand the officer. Similarly, the CBP

6

officer who conducted Yilmaz's secondary inspection testified that Yilmaz spoke only English during the inspection, that Yilmaz's English "appeared fine," that it was not difficult for the officer to understand Yilmaz, and that Yilmaz never stated during that ninety-minute period that he could not understand the officer. In addition, the record showed that Yilmaz had lived in the United States continuously since 1994, and that cellular telephones seized from his vehicle contained text messages in English. Further, and perhaps most importantly, the ICE agent who read the <u>Miranda</u> warnings testified that he paused after each line to ask Yilmaz whether he understood the warning and that after each such inquiry Yilmaz either nodded his head up and down or responded "yes." When Yilmaz once asked the agent to speak more slowly, the agent complied. The only possible ambiguity arises from one agent's testimony that Yilmaz asked the agents the meaning of the word "attorney." We note, however, that Yilmaz sought no further clarification after the agents explained that "attorney" is another term for "lawyer."

The District Court thus reasonably concluded that Yilmaz understood English sufficiently well to comprehend the <u>Miranda</u> warnings as given to him and waived those rights voluntarily and intelligently. After reviewing the record, we discern no basis to disturb those conclusions.

We have considered Yilmaz's remaining arguments and find them to be unavailing. Accordingly, the judgment of the district court is **AFFIRMED**.

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk

7