**UNITED STATES of America**

**v.**

**Magdy Mohamed IBRAHIM, Defendant.**

**No. 8:12–cr–356 (GLS).**

United States District Court, N.D. New York.

Feb. 11, 2014.

Richard S. Hartunian, United States Attorney, Katherine E. Kopita, Assistant U.S. Attorney, Plattsburgh, NY, for United States of America.

Lisa A. Peebles, Federal Public Defender, Gene V. Primomo, Assistant Federal Defender, Albany, NY, for Defendant.

### MEMORANDUM–DECISION AND ORDER

GARY L. SHARPE, Chief Judge.

#### I. *Introduction*

Defendant Magdy Mohamed Ibrahim has been indicted for making a false state-ment concerning his identity to Department of Homeland Security officers. (Dkt. No. 1); *see* 18 U.S.C. § 1001(a)(1). He moves to suppress statements made to those officers, principally arguing that they were obtained without a knowing, intelligent, and voluntary waiver of his *Miranda* rights.[1] (Dkt. No. 24.) For the reasons that follow, Ibrahim's motion is denied.

#### II. *Facts*

The relevant facts are based on the court's evaluation of the following: the applicable burden of proof; the testimony of officers Jason Sweet and Steven Prenoveau; the suppression hearing exhibits; Ibrahim's non-testimonial Declaration; and, the parties' submissions. *See* Fed.R. Crim.P. 12(d); *United States v. Miller*, 382 F.Supp.2d 350, 362 (N.D.N.Y.2005) (burden of proof); (Suppression Hearing Exs. 1–5, Dkt. No. 26 & 12/03/2013 Min. Entry (hereinafter "Ex. ——"); Dkt. No. 24; Dkt. No. 25.) The court fully credits the testimony of Sweet and Prenoveau, and discredits Ibrahim's Declaration.

Shortly after 8:00 A.M. on June 14, 2012, Ibrahim sought entry into the United States from Canada at a primary inspection lane located at the Champlain Port of Entry. He was operating a rental vehicle,

---

1. While it is clear that the parties know what statements the government intends to offer at trial, *see* Fed.R. Crim.P. 12(b)(4), 16(a)(1)(A)-(B), their submissions and suppression hearing evidence have left the court in the dark. Presuming, as the court does, that there are multiple statements, *see infra* Part II, the parties have: (1) failed to identify the substance of those statements; (2) failed to identify which statements are the subject of the motion; and (3) failed to identify all bases upon which suppression is sought. The court has addressed problems caused by such failures in the past. *See United States v. Tudoran*, 476 F.Supp.2d 205, 217–18 (N.D.N.Y.2007); *United States v. Miller*, 382 F.Supp.2d 350, 359–61 (N.D.N.Y.2005); *United States v. Elliott*, 363 F.Supp.2d 439, 443 (N.D.N.Y.2005); *United States v. DeLouya*, No. 1:04CR588, 2005 WL 3244173, *5–8 (N.D.N.Y. Nov. 30, 2005). Furthermore, the substance of statements, especially as they reveal the questions asked during border encounters, is now more important than when this court previously addressed border questioning. *Cf. United States v. FNU LNU*, 653 F.3d 144, 153 (2d Cir.2011) (custody determined by the totality of the circumstances which "include, and especially so in border situations, the nature of the questions asked") and *Tudoran*, 476 F.Supp.2d at 209–13. Despite these observations, it is clear in this case that the border encounter and all statements focused on Ibrahim's identity. Accordingly, the court is able to resolve the motion to suppress.

and he told the primary inspector that he was on his way to New York City. When questioned about his identity, Ibrahim presented an Italian passport bearing the name "Magdy Mohamed El Sayed." (Collectively referred to as "Statement 1.") Using the passport to query a Homeland Security database, the primary inspector discovered inconsistencies with El Sayed's name and date of birth which aroused suspicions about a possible match with a National Crime Information Center (NCIC) warrant alert concerning a subject named, "Ibrahim." After five minutes, the inspector referred Ibrahim to secondary inspection.

Ibrahim was instructed to exit his vehicle, and he was escorted a short distance to a secondary inspection building by two officers. The officers did not use handcuffs or physical restraints. The secondary building is a multi-purpose structure open to the public, and is part of a complex of structures and areas that comprise the Champlain Port of Entry. It is used for secondary immigration and customs inspections; it has a public foyer, tables, chairs, and restrooms; and, it has offices, and interrogation and detention areas. Ibrahim was instructed to sit in an open, public area and the officers notified the on-duty secondary inspector, Customs and Border Protection officer Sweet, that Ibrahim was there.

The escorting officers gave Sweet Ibrahim's Italian passport. Sweet then spoke to Ibrahim in English and requested that he complete a Customs declaration. (Ex. 4.) The declaration was written in English, Sweet discussed the form with Ibrahim in English, and it was completed in English. On the declaration, Ibrahim provided the following information: his name was "Magdy El Sayed"; he had resided in Italy for the past approximately seven years; he had previously lived in the U.S.

without status although he had applied for resident status; and, he had left the U.S. in 2001 for Egypt. (*Id.*) Ibrahim's answers on the declaration were appropriate to the questions asked. (Collectively referred to as "Statement 2.")

Sweet's ensuing actions focused exclusively on ascertaining El Sayed's true identity. After Sweet ran the information from Ibrahim's declaration through a Homeland Security database, he was still not satisfied that he had established a true identity. Accordingly, he fingerprinted Ibrahim, ran the prints through the database, and then received confirmation that "El Sayed" was, in fact, Ibrahim. He also learned that Ibrahim was named in an outstanding arrest warrant for a probation violation in the Eastern District of New York. He further learned that Ibrahim had a prior fraud conviction in the Eastern District, and that he had been deported in 2003 or 2004. At 10:00 A.M., Sweet arrested Ibrahim on the basis of the warrant, placed him in a detention cell, and advised Immigration and Customs Enforcement Special Agent Prenoveau of the arrest.

The secondary encounter lasted less than two hours. At all times, Ibrahim was in the public waiting room of the secondary building, but was told to remain there and was not free to leave. Sweet never displayed a firearm or used physical restraints of any kind. At all times, Sweet and Ibrahim communicated in English, Sweet understood all of Ibrahim's responses, and those responses were appropriate to the questions and events Ibrahim confronted. Ibrahim never told Sweet that he could not understand their conversation nor did he ever request an interpreter.

Shortly after noon, Prenoveau and Sweet moved Ibrahim to an interview room. Prenoveau advised Ibrahim of the warrant, asked him what his best language

was, and Ibrahim responded, "Arabic." Prenoveau asked him whether he understood English, and Ibrahim replied that he did. Prenoveau then used a prepared form to advise Ibrahim of his *Miranda* rights.[2] (Ex. 5.) In English, Prenoveau read each right to Ibrahim and after each, asked Ibrahim if he understood it. When Ibrahim said that he did, Prenoveau asked him to initial each one, and Ibrahim complied. (*Id.*) After the rights were read and initialed, Prenoveau read the *Miranda* waiver to Ibrahim who then said he understood, signed it, and agreed to speak.[3] (*Id.*) Ibrahim then made statements to Prenoveau, presumably those which are the subject of the indictment. (Collectively referred to as "Statement 3.") As earlier noted, the substance of the statements has not been disclosed by the parties.

Throughout the questioning, Prenoveau spoke to Ibrahim in English, Ibrahim responded in English, and his answers were appropriate to the questions asked. Ibrahim never asked for an interpreter. Neither Prenoveau nor Sweet ever displayed a weapon nor did they verbally or physically coerce Ibrahim in any way.

After Ibrahim was subsequently indicted and assigned CJA counsel, he initially appeared before Magistrate Judge Larry A.

Kudrle who advised him of his constitutional rights, including his right to remain silent. (Dkt. Nos. 1, 4–5, 7 & Min. Entries of 01/31/2013 and 02/12/2013); *see* Fed.R. Crim.P. 5(d)(1)(E). He was thereafter detained pending trial.

Subsequently, Ibrahim sent the court three letters written in English that complained about his attorney's assistance, his Egyptian persecution, and his efforts to obtain asylum in the United States. (Dkt. Nos. 10–11, 18; Exs. 1–3.) While those letters are grammatically stilted, both the content and language employed demonstrate Ibrahim's ability to comprehend and communicate in English.[4]

In a Declaration supporting his suppression motion, Ibrahim stated that he was conversant in Arabic, not English, and that he did not understand his communications with the officers, including any that may have pertained to his *Miranda* rights. Ibrahim did not testify at the suppression hearing. The court discredits his declaration.[5]

### III. *Discussion*

#### A. *Miranda, Custodial Interrogation, and the Border*

The facts and legal issues presented by this case are nearly identical to those re-

---

**2.** The rights recited on the form fully comply with the requirements of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

**3.** As pertinent, the *Miranda* waiver stated: "I have had the above statement of my rights read and explained to me and I fully understand these rights. I waive them freely and voluntarily, without threat or intimidation and without any promise of reward or immunity. I was taken into custody at 10:00 [A.M.], on 14 June 2012 ..., and have signed this document at 12:29 [P.M.], on 14 June 2012." (Ex. 5.)

**4.** When the government offered the exhibits during the suppression hearing, defense

counsel objected on the basis of both relevancy and a lack of foundation, the latter premised on the failure to authenticate. The letters are clearly relevant insofar as Ibrahim's comprehension of English is concerned, and foundational questions address weight not admissibility. The letters themselves and the circumstances pursuant to which Ibrahim filed them circumstantially warrant denial of his authenticity objection.

**5.** The court's prior observations regarding a defendant's failure to testify at a suppression hearing are apropos to its decision to discredit Ibrahim. *See Miller*, 382 F.Supp.2d at 362–63.

solved by the Second Circuit in *United States v. Yilmaz*, 508 Fed.Appx. 49 (2d Cir.2013). Legally, *Yilmaz* relied on the Circuit's recent border interrogation decision in *United States v. FNU LNU*, 653 F.3d 144 (2d Cir.2011), *see Yilmaz*, 508 Fed.Appx. at 51–52, and neither decision materially differs from this court's prior observations in *Tudoran*, *see* 476 F.Supp.2d at 209–13.

Insofar as primary and secondary border encounters are concerned, *Yilmaz* provides:

> An interaction between law enforcement officials and an individual generally triggers *Miranda*'s prophylactic warnings when the interaction becomes a custodial interrogation. The overarching custody question is whether a reasonable person in the suspect's position would have understood herself to be subjected to restraints comparable to those associated with a formal arrest. In determining whether a suspect is in custody for *Miranda* purposes, we consider, among other factors, the duration and location of the interrogation, the nature of the questions asked, whether the defendant volunteered for the interrogation, whether the officers used restraints, whether weapons were present or drawn, and whether the officers told the suspect he was free to leave or under suspicion. Practically speaking, the *most* important factor in determining whether *Miranda* applies at our borders will often be the objective function of an inspector's questions.

508 Fed.Appx. at 51–52 (internal quotation marks and citations omitted).

As to primary encounters, *Yilmaz* observed that a reasonable person expects some brief constraints and routine questions related to admissibility and would not believe himself subject to formal arrest. *Id.* at 52. Similarly, no reasonable person would believe himself subject to arrest during a secondary encounter where the circumstances are tantamount to "par for the course," *id.* (citing *FNU LNU*, 653 F.3d at 155), namely: a ninety-minute encounter in the public area of the secondary building (the same area at issue in this case); routine questions objectively addressing identity and admissibility; and completion of a customs declaration. *See id.* This observation is so despite the fact that the inspection is obviously more thorough and the person might not be free to leave. *See id.* Nor is the conclusion altered by the border officials' use of fingerprints to verify identity.

■ Applying these principles, it is clear that no reasonable person would have objectively believed he was in custody if confronting the totality of Ibrahim's circumstances during his primary and secondary inspection. The primary encounter lasted only five minutes, and any questions asked were designed to identify him, a quintessential function of all primary inspectors. Ibrahim remained in his car while the questions were asked, and all reasonable people—especially those foreign-born and traveling on a passport—expect such questions. So too, a reasonable person who understood there were questions about his identity would expect follow-up questions at a place other than the middle of a primary inspection station where others seeking admission might be waiting to approach.

The officers who escorted Ibrahim to secondary did nothing more than accompany him to that location. Once he arrived, Ibrahim was directed to a public area of a public building. While he was not then free to leave, the two hour secondary encounter with Sweet was entirely consistent with a routine secondary inspection seeking to confirm Ibrahim's identity. That encounter included completion of the Cus-

toms declaration, conversations about the information Ibrahim revealed, the fingerprinting, and the time necessary to check the information with the Homeland Security databases. There was no force or objective indicia of coercion.

Accordingly, Ibrahim was not in custody, *Miranda* warnings were unnecessary, and to the extent the government seeks to introduce Statements 1 and 2, they are admissible.

## B. *Custodial Interrogation and the Miranda Waiver*

At the time of Statement 3, Ibrahim was clearly in custody since he had been formally arrested and detained in a cell for two hours. Thus, the government must prove by a preponderance of the evidence that he was properly *Mirandized,* and knowingly, intelligently and voluntarily waived his rights.[6] *See Miller,* 382 F.Supp.2d at 361–62 (citing *Lego v. Twomey,* 404 U.S. 477, 489, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972); *United States v. Anderson,* 929 F.2d 96, 98 (2d Cir.1991)). Said otherwise, the government must prove that Ibrahim understood his *Miranda* rights, understood the consequences of waiving those rights, and, under the totality of the circumstances, made an uncoerced choice to do so with the requisite level of comprehension as to what he was doing. *See Yilmaz,* 508 Fed.Appx. at 52 (*citing United States v. Jaswal,* 47 F.3d 539, 542 (2d Cir.1995); *United States v. Male Juvenile (95–CR–1074),* 121 F.3d 34, 40 (2d Cir.1997)).

In his Declaration, Ibrahim denies that he was *Mirandized,* but asserts that, if he was, he failed to understand his rights or his waiver because he was not conversant with English. Having credited the officers' testimony and discredited Ibrahim's Declaration, the court has already found that Prenoveau fully advised Ibrahim of the requisite *Miranda* rights, and that Ibrahim executed a valid waiver. Thus, the only issue is whether the government proved that Ibrahim understood the rights and his waiver given his level of English comprehension.

■ As the Circuit has said, "a lack of fluency in English does not automatically preclude a defendant from executing a knowing and voluntary waiver of rights in that language." *United States v. Ocasio,* 80 Fed.Appx. 127, 129 (2d Cir.2003) (citing *Jaswal,* 47 F.3d at 542; *Campaneria v. Reid,* 891 F.2d 1014, 1020 (2d Cir.1989)). Where, as here, English comprehension is the sole issue, the quintessential question is whether the government has proved by a preponderance of the evidence from the totality of the circumstances that Ibrahim had a command of English sufficient to find that he understood his *Miranda* rights and the consequences of his waiver. *See Yilmaz,* 508 Fed.Appx. at 52–53; *Jaswal,* 47 F.3d at 542; *Campaneria,* 891 F.2d at 1020.

■ A brief summary of the court's factual findings is sufficient to demonstrate that Ibrahim's grasp of English was sufficient to answer that quintessential question in the affirmative: throughout all three encounters, Ibrahim communicated

---

**6.** While Ibrahim argues that he did not understand his conversation with Prenoveau and Sweet, he has not claimed that his subsequent statements were the by-product of verbal or physical coercion and thereby waived any such argument. In any event, he would be hardpressed to argue coercion given the court's subsequent conclusion that he was properly *Mirandized* and waived his rights. *See United States v. McFarland,* 424 F.Supp.2d 427, 434 (N.D.N.Y.2006) (citing *Dickerson v. United States,* 530 U.S. 428, 444, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000)).

in English, his responses were appropriate to questions asked, he never requested an interpreter, and he never said that he failed to understand; his answers to the questions on the customs declaration and his three written communications with the court reflect an ability to converse and communicate in English; he had previously resided in the United States as an unlawful alien; his *Miranda* warnings were individually read to him and he initialed them, signaling his understanding; and his *Miranda* waiver was read to him and he signed it, again signaling his understanding. Thus, Ibrahim understood his *Miranda* rights, validly waived them, and Statement 3 is admissible.

### IV. *Conclusion*

**WHEREFORE,** for the foregoing reasons, it is hereby

**ORDERED** that Ibrahim's motion to suppress (Dkt. No. 24) is **DENIED;** and it is further

**ORDERED** that the Clerk provide a copy of this Memorandum–Decision and Order to the parties.

**IT IS SO ORDERED.**