**UNITED STATES of America**

v.

**Dominick MEMOLI, Defendant.**

**No. 04 Cr. 140 (JSR).**

United States District Court,
S.D. New York.

Sept. 17, 2004.

Lawrence DiGiansante, Bronx, NY, for Defendant.

Daniel W. Levy, Assistant United States Attorney, New York, N.Y, for Plaintiff.

*MEMORANDUM ORDER*

RAKOFF, District Judge.

Defendant Dominick Memoli moves to suppress various statements he gave following his arrest on November 13, 2003, as well as the fruits of a search conducted that same day of an apartment Memoli occupied, along with the primary tenant, Deborah Ventrella, at 1629 Hobart Avenue, Bronx, New York. At a two-day evidentiary hearing held on August 13 and August 17, 2004, the prosecution called three witnesses from the New York Police Department, namely, Lieutenant Keith Loughran, Police Officer Christopher Alicea, and Sergeant Kevin Crimmins, while the defense presented the testimony of Ms. Ventrella and of the defendant himself. In *Rashomon*-like fashion, no two witnesses gave the same account of what occurred, and several of the witnesses gave testimony that was either internally inconsistent or so implausible as to defy credulity. Nevertheless, after careful observation of each witness's demeanor and careful review of each witness's testimony, the Court finds that the following is what occurred:

In April 2003, Ventrella, a third-grade teacher at a school in the Bronx, invited Memoli, with whom she had developed a romantic relationship, to move into the apartment at 1629 Hobart Avenue in which she resided along with her three children (approximate ages: 14, 12, and 10). Transcript of suppression hearing ("tr."), 4–6.[1] Thereafter, Ventrella freely shared the apartment with Memoli and gave him keys and unconstrained access to the premises.

---

1. The transcript citations given at various points in this Memorandum Order refer to some, but not necessarily all of the testimony supportive of the respective findings to which given citations relate. Where no direct citation is given for a particular factual finding, or where the testimony referred to by a particular citation does not explicitly support the corresponding factual finding, it means that the fact was inferred from circumstantial evidence rather than from direct testimony. As for testimony given at the hearing that was contrary to the facts here found, it should be assumed that the Court found such testimony unworthy of belief or otherwise unreliable.

Tr. 28. However, although Ventrella knew Memoli had a prior criminal record, Ventrella was unaware that Memoli was the subject of two outstanding arrest warrants—one for a felony assault charge and the other for a parole violation—as well as being a subject of an ongoing investigation into unlawful possession of firearms (the crime for which he is here charged). Tr. 33, 36, 57, 123, 241.

The police officer having immediate charge of that firearms investigation was Alicea, who had repeatedly been told by a reliable confidential informant that Memoli was unlawfully dealing in handguns. In conversations with Alicea beginning around October, 2003, the informant indicated that Memoli had recently been in possession of a cache of approximately 15 guns, and had already sold most of them, but still had several guns stored at the apartment he shared with Ms. Ventrella. Tr. 121–22, 128. On this basis, Alicea, after surveilling the premises at 1629 Hobart Avenue, was preparing to get a search warrant on November 13, 2003 when he learned that the informant was temporarily unavailable. Tr. 165–66. Concerned that Memoli might sell the remaining guns before the informant became available and a warrant obtained, Alicea, along with a Detective Gonzalez, again staked out the premises at 1629 Hobart Avenue, at which point, around 5 p.m., they noticed a male who appeared to be Memoli walking with a female (Ventrella) away from the building. Tr. 124–25. After ascertaining (through a ruse) that the male was indeed Memoli, they arrested and handcuffed him. Tr. 126. However, neither at that time nor at any time prior to much later that evening did any officer give Memoli his "*Miranda* warnings." Tr. 174.

Following Memoli's arrest, he and Ventrella were transported in an unmarked police vehicle the short distance back to 1629 Hobart Avenue. Tr. 11, 127–28. There, while Memoli remained inside the police vehicle, Ventrella was escorted onto the sidewalk but was not permitted to re-enter the premises at 1629 Hobart Avenue or to telephone her children inside, about whom she was expressing concern. Tr. 12, 37, 222. Soon, however, one of her children called her on her cell phone, and she was permitted to answer the call and reassure the child. Tr. at 12, 130.

Meanwhile, Alicea attempted to obtain permission from both Memoli and Ventrella to search the apartment, but both said no. Tr. 129–30, 222. As part of that discussion, one or more police officers suggested to Ms. Ventrella that, if she did not consent, they would have to "freeze" access to the apartment while they obtained a search warrant, entailing continued separation from her children; but she continued her refusal. Tr. 14–15, 60–61.

After about ten or fifteen minutes, there arrived on the scene Alicea's supervisors, Crimmins and Loughran, who had been notified at the time of the arrest. Tr. 57, 180–81. They also brought with them a female police officer, Hennessey. Tr. 58, 134. Alicea informed Crimmins that neither Memoli nor Ventrella had consented to a search and that "freezing" the scene until a search warrant could be obtained might involve extended delay, given the unavailability of the informant. Tr. 130–31, 182–83.

Crimmins then entered the vehicle where Memoli was being held and told Memoli that the police knew Memoli was a parole violator with a warrant out for his arrest but that they also had reason to believe that there were dangerous items inside the house that the police wanted to remove. If the police had to, Crimmins said, they would get a search warrant, but they would prefer to get Memoli's consent.

Tr. 183–84. While Memoli (an experienced felon with a lengthy record) silently pondered the situation, Crimmins exited the vehicle and told Ventrella that there were dangerous items inside the house that the police would like her consent to remove; but Ventrella once more refused. Tr. 184–85.

Crimmins thereupon returned to the vehicle and told Memoli, in effect, that if Memoli would allow the police to enter the apartment and lead them to the firearms that they believed were stored there—as well as persuading Ventrella to likewise consent to the entry [2]—then, regardless of what charges they might bring against Memoli relating to the firearms, they would not charge Ventrella or otherwise pursue a case against her. Tr. 185–86, 225–26. After a short pause, Memoli agreed to the arrangement and admitted that he did in fact have "four or five guns" in the apartment, which he would help the police to locate. Tr. 189–90, 229–30. Memoli also called Ventrella over to the vehicle, and convinced her to consent to the entry. Tr. 16–17, 190–91.

Led by Ventrella and Hennessey, the police then entered the apartment. Tr. 22, 191. Memoli guided them to a duffel bag he had placed underneath the bed that he shared with Ventrella. Tr. 191–92, 228. Alicea opened the bag and found four guns inside. Because Memoli had told Crimmins that he had secreted four "or five" guns in the apartment, Alicea questioned Memoli about the fifth gun's location. Memoli said that he must have been mistaken as to the possibility of a fifth gun, because the only guns he had were the ones in the bag. Tr. 137, 230.

One of the officers then asked Memoli for an "*ID.*" Memoli told them it was on

top of his nightstand. Tr. 192, 229. Alicea started towards one of the two nightstands (which were on either side of the bed) but stopped when that nightstand was identified as Ventrella's. Tr. 138, 228. Alicea then went to the other nightstand and opened several drawers, in one of which he discovered a scanner, two sets of handcuffs, and an imitation police shield. Tr. 73, 192. Only then did he look on top of the nightstand, where he found Memoli's driver's license. Tr. 107, 141.

Following this limited search, Ventrella was left at the apartment, uncharged, but Memoli was taken to the 45th Precinct station house, where, after receiving full *Miranda* warnings, he hand-wrote a brief statement acknowledging his possession of the guns but exonerating Ms. Ventrella of any knowledge of the weapons. Tr. 143–44, 232–33, 262–63; Gov. Ex. 10. He did not answer any questions or make any statement about the scanner, handcuffs, or shield. Tr. 145.

Based on the foregoing factual findings, several legal conclusions follow:

■ *First,* in the absence of any prior *Miranda* warnings, Memoli's self-incriminating statements about the existence, location, and number of guns made while he was in the vehicle and later in the apartment must be suppressed. The Government's only argument for not suppressing these statements is that they were elicited in response to questions made necessary by the alleged threat to public safety created by the existence of unlicensed guns in the apartment. *See, e.g., New York v. Quarles,* 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984); *United States v. Newton,* 369 F.3d 659, 677 (2d Cir.2004). Here, the delay of approximately one month be-

---

**2.** While either Memoli's or Ventrella's consent would have been legally sufficient to enter the apartment, the police had by this time ascertained that only Ventrella had brought the keys to the apartment with her. Tr. 250.

tween the time the police first learned Memoli was selling guns and the time they arrested him, tr. 81—during which period Memoli sold most of his cache of 15 guns—indicates that there was no pressing public safety emergency. Nor did the discovery by the police that there were children in the apartment change this analysis materially, since there was no evidence whatever that Memoli himself had been attempting to use these weapons or making threats in any way against anyone and since Ventrella, despite her obvious concern for her children's welfare, did not regard the revelation that there might be guns on the premises as any reason to give her consent to the search. If at the time of Memoli's arrest the police felt some sense of urgency, it was only, the Court finds, because they feared that if no search could be promptly conducted (because of absence of consent and delay in obtaining any search warrant), Memoli or persons associated with him might remove any remaining guns from the apartment and thereby thwart any prosecution of Memoli on weapons charges.

■■■ *Second*, the suppression of Memoli's pre-*Miranda* statements in no way vitiates Memoli's and Ventrella's consent to the entry of their apartment or Memoli's consent to the search of the duffel bag and seizure of guns therefrom. The absence of *Miranda* warnings does not make consent to a search invalid *per se*. *See, e.g., United States v. Moreno*, 897 F.2d 26, 33 (2d Cir.1990) (*citing Schneckloth v. Bustamonte*, 412 U.S. 218, 246, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)); *United States v. Puglisi*, 790 F.2d 240, 243–44 (2d Cir.1986); *United States v. Faruolo*, 506 F.2d 490, 495 (2d Cir.1974) ("The argument that *Miranda* warnings are a prerequisite to an effective consent to search is not at all persuasive.... There is no possible violation of fifth amendment rights

since the consent to search is not 'evidence of a testimonial or communicative nature.'") (*quoting Schmerber v. California*, 384 U.S. 757, 761, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966)).

■■ To be sure, a consent to search that is obtained from a person in custody does require very careful scrutiny, *United States v. Puglisi*, 790 F.2d at 240 (2d Cir. 1986). But here, the Court finds, the credible evidence fully supports the Government's claim that Memoli's consent was the product of an entirely voluntary bargain (to which the police, with one exception, described *infra*, scrupulously adhered) that, in return for Memoli's consent, the police would limit their search to his guns and would neither charge Ventrella with any accessory crime nor seek to develop any evidence against her. As for Ventrella's consent, it was demonstrably not the result of any police coercion—for she steadfastly refused their entreaties or, as she allegedly perceived them, threats—but wholly the product of Memoli's persuasion after he had made his bargain with the police.

Obviously, the police made use of Memoli's romantic attachment to Ventrella as a bargaining chip. But while this might have been unchivalrous on their part, it was in no way unlawful or "coercive" in the sense here relevant. As anyone with Memoli's criminal experience must have recognized, Ventrella faced a very real possibility of being arrested if illegal guns were found in her apartment. From Crimmins' description to Memoli of what the police officers already knew, Memoli also had every good reason to believe Crimmins' statement that, if no consent to search was given, the police would simply "freeze" the crime scene until a search warrant was obtained (which they could have likely obtained once the informant was located), tr. 165–66, 179. *See United States v. Calvente*, 722 F.2d 1019, 1023 (2d Cir.1983)

("[A]dvising a person of the fact that a search warrant can be obtained does not constitute coercion."); *Faruolo*, 506 F.2d at 495 ("[T]he well founded advice of a law enforcement agent that, absent a consent to search, a warrant can be obtained does not constitute coercion.").

In these circumstances, the bargain to which Memoli agreed—leading the police to the guns in return for a complete exoneration of Ventrella—was a "good deal" and one that, after due reflection, he voluntarily agreed to. *See United States v. Ceballos*, 812 F.2d 42, 51 (2d Cir.1987) (no improper coercion where police warned defendant of "disruption to his household" if they had to obtain a search warrant on the one hand and "promised him aid in obtaining low bail and retaining his job if he cooperated" on the other); *United States v. Morrow*, 731 F.2d 233, 236 (4th Cir. 1984) (defendant's girlfriend's consent is not improper even though obtained after police threatened her with being charged as accessory); *United States v. Kolodziej*, 706 F.2d 590, 594–95 (5th Cir.1983) (Wisdom, J.) (not improper coercion when wife consented to search when she was afraid that her children would be taken away from her and to help her avoid criminal charges, as well as to help her husband get out on bond); *United States v. Perez*, 198 F.Supp.2d 406, 414–15 (S.D.N.Y.2002) (no coercion when defendant consented to search after police, who knew that defen-

dant's daughter and mother were in apartment, said "if there is contraband in that apartment, whoever is in that apartment could go to jail for that").[3]

■ *Third*, although the police otherwise meticulously honored the bargain that the Court finds they made with Memoli, their search of the drawers of his nightstand under the guise of trying to find a driver's license that he had indicated was located on top of the nightstand (where, in fact, it was readily found) was without lawful justification. *See* tr. 106–07, 141, 192, 230. While the Government now tries to argue that this search might be justified as a search for the "missing" fifth gun, none of the three police witnesses claimed that was their intent; indeed, if it had been, they would have presumably made far wider searches than they did. Accordingly, the fruits of the search of the nightstand drawers, including the scanner, handcuffs, and counterfeit shield, must be suppressed.

■ *Fourth*, unlike Memoli's pre-*Miranda* statements that must be suppressed, *see supra*, his brief written statements, exonerating Ventrella but implicating himself, were made voluntarily after he had received and acknowledged in writing full *Miranda* warnings. Although defendant argues that his written statements were the product of his earlier, pre-*Miranda* oral statements and/or

**3.** That the police had every reason to believe that Ventrella could properly have been arrested as an accessory or, at a minimum, for constructive possession of the illegal weapons distinguishes this case from the two cases on which defendant primarily relies, *United States v. Finch*, 998 F.2d 349 (6th Cir.1993) and *United States v. Bolin*, 514 F.2d 554 (7th Cir.1975). In *Finch*, the Sixth Circuit found that a defendant's confession was coerced when given to avoid the arrest of family members for possession of cocaine that was actually his. In *Bolin*, the Seventh Circuit found that the defendant's consent to a search was

coerced when given in exchange for an officer's promise not to arrest the defendant's girlfriend. In neither of these cases was there evidence that the police had any legitimate reason to suppose that the third party whom the defendant sought to protect could have been lawfully arrested, whereas here, as noted, Ventrella was potentially liable for arrest for, at the very least, constructive possession of illegal firearms. In addition, this Court is not persuaded that either *Finch* or *Bolin* necessarily accords with the law of the Second Circuit.

of his "coerced" consent to the "deal" previously described, in actuality the "deal" was voluntary and consensual, *see supra,* and the combination of the intervening passage of many hours, the change of locale, and the administration of full *Miranda* warnings entirely removes any taint from the obtaining of the earlier pre-*Miranda* statements. Memoli, the Court finds, was, if anything, anxious to write these statements to exonerate Ventrella while implicating himself only in the gun-related crimes of which the police already had ample independent evidence.

Accordingly, for the foregoing reasons, the defendant's motion to suppress is hereby granted as to the defendant's pre-*Miranda* statements and as to the evidence recovered from within the drawers of his nightstand but is denied in all other respects. Counsel are directed to jointly call Chambers at 1 p.m. on September 23 to set a trial date.

SO ORDERED.