**UNITED STATES of America**

v.

**Sixto ORTIZ, Defendant.**

**No. 12 Cr. 791 (RJS).**

United States District Court,
S.D. New York.

May 9, 2013.

Joshua A. Naftalis, Assistant United States Attorney, United States Attorney's Office, New York, NY, for United States of America.

Annalisa Mirón and Julia L. Gatto of the Federal Defenders of New York, Inc., New York, NY, for Sixto Ortiz.

MEMORANDUM AND ORDER

RICHARD J. SULLIVAN, District Judge:

Defendant Sixto Ortiz ("Defendant") is charged in a one-count indictment (the "Indictment") with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g). Now before the Court is Defendant's motion to suppress (1) physical evidence seized during a warrantless search of his mother's apartment; (2) statements Defendant made to New York City Police Department ("NYPD") officers at the apartment after the search; (3) statements Defendant made to NYPD officers at the police station following his arrest; and (4) statements Defendant made to an agent of the federal Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") following his arrest on a federal warrant. For the reasons set forth below, the Court grants Defendant's motion as to his statements in the apartment and denies the motion as to the remaining evidence.

I. PROCEDURAL HISTORY

Defendant was arrested pursuant to a federal warrant on September 17, 2012. On October 17, 2012, a grand jury returned the Indictment, charging Defendant with violating 18 U.S.C. § 922(g) by being a felon in possession of a firearm. (Doc. No. 9.) Defendant filed the instant motion on December 21, 2012 (Doc. No. 13), together with a Memorandum of Law in Support of the Motion ("Def. Mem.") (Doc. No. 15). On January 7, 2013, the government filed its Memorandum in Opposition to the Motion ("Gov't Opp'n") (Doc. No. 16), and Defendant filed his Reply on January 14, 2013 ("Def. Reply") (Doc. No. 17). Because Defendant's motion turned on several contested factual issues, the Court held an evidentiary hearing on January 24, 2013, at which the government called four witnesses—NYPD Sergeant Janette Cruz ("Cruz"), NYPD Officer Isaias Martinez ("Martinez"), NYPD Detective Johnnie Rosario ("Rosario"), and ATF Special Agent Veronica Morales ("Agent Morales")—and Defendant called one—Rosa Montañez, Defendant's mother ("Montañez"). Defendant and the government each cross-examined one another's witnesses. On February 8, 2013, the parties submitted supplemental

memoranda regarding Defendant's motion ("Def. Supp. Mem." and "Gov't Supp. Mem.") (Doc. Nos. 20, 21), and the Court held oral argument on February 26, 2013.

## II. FINDINGS OF FACT[1]

On July 24, 2012, Cruz, a sergeant in the NYPD Criminal Intelligence Section, received a tip that an illegal handgun was located at 380 East 143rd Street, Apartment 12F, Bronx, New York (the "Apartment"). (Tr. at 13:14–14:19.) Upon receiving the tip, Cruz ascertained that the Apartment had two residents: Montañez, the leaseholder, and Defendant. (*Id.* at 14:24–15:8.) Cruz also determined that Defendant had two outstanding bench warrants for failing to respond to summonses related to dog-walking and alcohol consumption. (*Id.* at 17:15–24.) Around 5:00 p.m. that day, Cruz, together with three other NYPD officers—Martinez, Detective Jaquan Morales ("Detective Morales"), and Officer David Montañez ("Officer Montañez")—went to the Apartment. (*Id.* at 15:9–16.) The four officers were dressed in plainclothes but were wearing bulletproof vests and had their shields visible around their necks. (*Id.* at 15:18–19.) In addition, they were carrying police radios, guns, and handcuffs. (*Id.* at 56:13–16.) Although the purpose of their visit was to investigate the tip concerning the firearm, Cruz also intended to arrest Defendant on the outstanding bench warrants. (*Id.* at 43:10–25.)

The NYPD officers were able to obtain entry to 380 East 143rd Street without being buzzed in and went up to the 12th Floor, where they knocked on the Apartment's front door. (*Id.* at 15:20–22, 44:1–5.) Montañez answered. (*Id.* at 15:23–24, 55:23–56:1.) The parties dispute whether the officers identified themselves as police.

The Court, however, finds that Cruz and Martinez both testified credibly that the officers identified themselves as such when Montañez answered the door. (*Id.* at 15:25–16:4, 56:10–12.)

By contrast, the version of events Montañez offered strains belief. Montañez testified that the officers did not identify themselves. Rather, she stated that when she came to the door and looked through the peephole, she believed the officers were Jehovah's Witnesses. (Tr. at 126:1–2.) She then opened the door, she explained, because she sometimes engaged Jehovah's Witnesses in conversation in order to convert them to Catholicism, her faith. (*Id.* at 126:4–9.) Montañez testified that when the officers then asked if Defendant was present in the apartment, she concluded that they were not Jehovah's Witnesses and instead assumed that they were Defendant's friends. (*Id.* at 126:12–15.) She testified that she admitted them into the apartment on that basis and proceeded to speak with Cruz for several minutes while continuing to believe that the officers were Defendant's friends. (*Id.* at 126:17–128:18.) The other officers did not accept her invitation to sit down in the living room. (*Id.* at 126:21–25.) It was only when the officers began searching the closets, Montañez testified, that she realized they were police. (*Id.* at 128:16–18.)

Montañez's version of events is not credible for several reasons. First, her affidavit dated December 19, 2012 stated only that "[o]n July 24, 2012, four officers arrived at my door dressed in civilian clothes." (Decl. of Julia Gatto, dated Dec. 21, 2012, Doc. No. 14 ("Gatto Decl."), Ex. A ("Montañez Aff.") ¶ 4.) The affidavit makes no reference to having admitted the

1. The following facts are taken from the transcript of the January 24, 2013 hearing ("Tr.") and exhibits submitted by Defendant in connection with his motion. The Court has also considered the parties' memoranda of law in deciding this motion.

officers based on the belief that they were her son's friends—an account she first offered only at the January 24, 2013 evidentiary hearing. Second, Montañez's uncorroborated testimony flatly contradicts the accounts offered by Cruz and Martinez, veteran officers with twenty and eleven years of experience, respectively, both of whom testified that the officers not only identified themselves as police when Montañez came to the door but were outfitted in a manner that made their identity as law enforcement officers unmistakable. (*See, e.g.*, Tr. at 15:18–19 (indicating that the officers had their shields visible).) Finally, Montañez's claim that she realized the four officers were police only when they began to search the closets is simply incredible, even under the terms of her own testimony. In the time between the officers' entrance into the apartment and the beginning of their search, according to Montañez, the officers said nothing to reinforce her belief that they were Defendant's friends and behaved in a manner highly inconsistent with a social call, spreading out over the apartment and ignoring her invitation to sit down in the living room. (Tr. at 126:24–128:2.)

In any event, Montañez voluntarily admitted the officers to the Apartment, which was, at the time, occupied by three individuals: Montañez, Defendant, and Montañez's elderly sister. (*Id.* at 57:1–7, 125:11–13.) It is undisputed that after Montañez admitted the officers to the Apartment, Cruz and Montañez engaged in conversation in Spanish (*id.* at 16:7–8, 56:2–5, 127:9–10), which Cruz and Martinez speak fluently (*id.* at 14:9, 55:10–13). Once again, however, the parties offer different versions of what transpired. Specifically, Cruz testified that upon entering the Apartment, she went with Montañez to the kitchen. (*Id.* at 19:6–8.) There, she told Montañez that the NYPD had received information that there was a gun in one of the closets by the front door of the Apartment. (*Id.* at 18:18–19:5.) When Montañez responded that there was no gun there, Cruz explicitly asked her if the officers could search those closets to make sure, and Montañez consented to the search. (*Id.* at 19:29–20:2, 21:3–22.) From Cruz's account, it was clear to Montañez that Cruz was asking permission to search the closets by the front door. (*Id.* at 21:5–22:13.) Cruz then asked Montañez to sign a written consent-to-search form. Because the form was written in English, Cruz explained its contents "in sum and substance" to Montañez in Spanish—a practice Cruz had employed on previous occasions. (*Id.* at 23:18–24:4.) Montañez then filled in her name, address, and date of birth and signed the form. (*Id.* at 25:17–26:14.) After Montañez signed the document, and *only* after she signed the document, Cruz told the other officers that they could begin the search.[2] (*Id.* at 27:11–12.)

---

**2.** Cruz testified, "I told them that it was a go." (Tr. at 27:24; *see also id.* at 47:12–16 (testifying that she used the very words, "It's a go").) Martinez testified that Cruz said, "[Y]ou guys can begin looking. We have consent." (*Id.* at 58:23.) Defendant argues that these accounts "contrast starkly" and discredit both officers' testimony. (Def. Supp. Mem. 9.) The Court disagrees. First, the recollections of what Cruz said are identical in substance; in both cases, Cruz clearly indicated to the officers that they could begin searching. Second, the fact that the officers do not have identical memories of what Cruz said is far outweighed by the overall consistency of their accounts—from how the officers were dressed (Tr. at 15:18–19, 56:11–14), to what was said when they entered the Apartment (*id.* at 15:24–16:4, 56:18–20), to where Cruz and *Montañez spoke (id. at 19:6–8, 58:12–13),* to the substance of what Cruz told them. The mere fact that their memories differ about the precise words of one, unremarkable sentence uttered exactly six months earlier does not undermine the officers' credibility.

Montañez remembers the events differently. She also recalls talking with Cruz for several minutes, but she testified that they spoke in the living room and that Cruz talked only of "silly things that I wasn't interested in." (*Id.* at 127:17–18.) She also testified that Cruz did not request her consent, either orally or in writing, before the officers initiated the search. (*Id.* at 128:19–22.) Rather, she said the officers "took [her] by surprise" and simply began searching the closets. (*Id.* at 128:22.) According to Montañez, Cruz obtained her signature on the consent form only *after* the search was complete and the officers and Defendant had moved into the hallway outside the apartment. (*Id.* at 130:10–16.) Montañez further testified that Cruz never translated the form into Spanish. (*Id.* at 131:7–10.) She also testified that she merely signed the form and that the remaining handwriting on the form is not hers. (*Id.* at 129:13–24.) Finally, she testified that the birthdate on the form is incorrect. (*Id.* at 129:20–130:2.)

Several features of the testimony at the January 24 hearing make the officers' version of events more credible than Montañez's. First, as noted above, Montañez's claim that she did not realize the four officers were police until they started searching the closets is so incredible as to cast doubt on her credibility overall. Second, Cruz and Martinez corroborated all the key facts of one another's testimony; Montañez's testimony, by contrast, is uncorroborated. Finally, Montañez's account of events—including the bizarre assertion that Cruz and Montañez engaged in several minutes of "silly" chit-chat before the officers, without any warning or provoca-

tion, started to search the closets—simply defies common sense.

While Cruz and Montañez were speaking in the kitchen, the other officers began talking to Defendant in the Apartment's narrow hallway[3] by the closets. (*Id.* at 58:5–13.). Martinez told Defendant of the two bench warrants for his arrest, which Martinez was holding. (*Id.* at 71:15–72:6.) Martinez and the other officers spoke with Defendant "for several minutes" (*id.* at 72:2–4) until Cruz informed them that they had consent to search, at which point Martinez and Officer Montañez began to search the closets (*id.* at 73:7–74:14). When Martinez went to open the second closet, Defendant told him, "[T]hat's my closet, you are not going to find anything in there." (*Id.* at 59:5–6.) Martinez proceeded to search the closet and discovered a gun inside the breast pocket of a black leather jacket.[4] (*Id.* at 59:13–14.) When Martinez found the gun, Defendant said, "[O]h, I've seen that here before, but my nephew and other people come here and they put property away. And in this closet, they put stuff in these closets." (*Id.* at 59:24–60:1.) Martinez responded that it was illegal for the gun to be in the Apartment and asked for the names of any persons Defendant believed were responsible for the gun. (*Id.* at 60:3–8.) When Defendant hesitated to give Martinez any names, Martinez told hi m,

[T]here are several options available to us. One ... is that we are going to place everybody under arrest in the apartment, return to the precinct, and then conduct our own full and thorough investigation. Unfortunately, that means that your mother and [aunt] may be possibly ... put under arrest.

---

**3.** Martinez estimated that the hallway is roughly three feet wide. (Tr. at 72:18–20.)

**4.** Later, at the precinct, Martinez discovered a box of ammunition in the same breast pocket. (Tr. at 59:16–19.)

(*Id.* at 60:9–15.) Defendant then said, "Listen, leave my mother out of this. The gun is not hers. Just take me. It's mine. But please don't tell her anything." (*Id.* at 60:17–19.)

The officers then asked Defendant to step outside the Apartment, where they placed him under arrest. The undisputed testimony is that at no point while the officers were in the Apartment did either Montañez or Defendant ask them to leave or stop the search. (*Id.* at 32:8–17, 60:25–61:10.) Furthermore, it is undisputed that at no point did the officers raise their voices, brandish their weapons, take out their handcuffs, or restrain Defendant or Montañez in any way. (*Id.* at 32:18–34:3, 61:11–62:11.)

After arresting Defendant, the officers took him to the 40th Precinct of the NYPD. They placed him in the precinct's field intelligence office, which Cruz, Martinez, and Officer Montañez shared. (*Id.* at 34:6–13, 62:17–22.) Defendant was seated on a bench in handcuffs. (*Id.* at 78:18–21.) Martinez then began to process Defendant's arrest. (*Id.* at 34:23–24, 63:3–19.) With a *Miranda* form in front of Defendant, Martinez asked him if he wanted to write a statement explaining why he had the handgun. Martinez added that, before Defendant could write such a statement, Martinez would have to read him his rights. (*Id.* at 63:18–19.) Defendant quickly answered that he did not want to write or say anything. (*Id.* at 63:20–23.) Martinez acknowledged Defendant's right to remain silent and told him to "hang tight" and "wait until you get to court [and] speak to your attorney." (*Id.* at 63:24–64:1.) At no point did Martinez fully advise Defendant of his rights, nor did Martinez or Cruz ask him any substantive questions. (*Id.* at 35:2–4, 64:14–21.)

Sometime after Defendant invoked his right to remain silent, Rosario, a narcotics detective, arrived at the 40th Precinct to interview Defendant. (*Id.* at 36:1–3, 65:13–18.) Cruz had called Rosario after arresting Defendant because Rosario was conducting a narcotics investigation in the Mott Haven Houses, where the Apartment was located. (*Id.* at 50:17–25, 88:5–13.) When Rosario entered the office, Martinez left to give him privacy, and at some point Cruz left the office too. (*Id.* at 51:22–23, 65:20–23.) Rosario did not know whether Defendant had received *Miranda* warnings and thus proceeded to administer them orally before beginning his interrogation. (*Id.* at 88:20–89:3.) Rosario testified that in response to receiving the *Miranda* warnings, Defendant said, "[S]ure, okay." (*Id.* at 89:5, 90:22.) Rosario proceeded to question Defendant about activities in the Mott Haven Houses but did not ask him any questions about the gun. (*Id.* at 91:10–11.)

During the course of Rosario's ten-to-fifteen minute interview (*id.* at 91:24–25), Martinez reentered the office and told Cruz, "I just called ECT. I requested them to swab the firearm" (*id.* at 67:5–6; *see also id.* at 36:21–22).[5] Overhearing this, Defendant made self-incriminating statements to the effect that the firearm was his and that ECT would find his fingerprints on it. (*Id.* at 36:23–37:1, 67:6–10.)

Following Defendant's arrest in connection with the illegal firearm, the Bronx District Attorney's Office commenced criminal proceedings against Defendant in New York State Supreme Court, Bronx County. Defendant received appointed counsel to represent him in those proceedings (the "state attorney"). (Gatto Decl., Ex. B ("Ortiz Aff.") ¶ 9.) On September 17, 2012, however, when Defendant appeared at the Bronx courthouse in connection with

---

5. "ECT" is the NYPD's Evidence Collection Team.

the state prosecution, ATF Special Agent Morales arrested him on a federal warrant related to his possession of the illegal handgun. (*Id.* ¶ 10; Tr. at 105:22–106:3.) Before taking Defendant to her office for processing, Agent Morales read Defendant the *Miranda* warnings off a card she kept in her wallet. (*Id.* at 106:8–10.) Though she advised Defendant of his right to an attorney, she did not specifically advise him of his right to consult his state attorney. (*Id.* at 106:21–23.) Agent Morales told Defendant that she would not question him about his state arrest but that if he wanted to talk to her, he could. (*Id.* at 108:5–7.) Defendant then made unprompted statements that led Agent Morales to "engage[ ] him in a conversation." (*Id.* at 108:8–18.) When Defendant then began to speak about the gun found in the Apartment, Agent Morales told him, "I can't talk to you about that." (*Id.* at 108:19–20.) Defendant nevertheless insisted that he wanted to speak about the gun, and he went on to state that he had touched the gun and that "[t]his kid [presumably a reference to Defendant's nephew] ... is supposed to come up and ... take the rap." (*Id.* at 108:20–22, 109:11.)

### III. Discussion

#### A. Physical Evidence in the Apartment

■ Defendant moves to suppress the physical evidence seized from the Apartment's closet as having been obtained in violation of Defendant's Fourth Amendment rights. Specifically, Defendant argues that the police never obtained consent to conduct a warrantless search of the Apartment. (Def. Mem. 3–5; Def. Supp. Mem. 9.)

The Court, however, finds that Montañez, at a minimum, orally consented to the search. In testimony the Court found highly credible, Cruz said that she explained to Montañez why the police were in the Apartment, told Montañez that they

believed the gun was in one of the hallway closets, requested permission to search the closets, received oral and written permission to do so, and relayed that permission to her fellow officers, who then conducted the search. (Tr. at 18:18–27:13.) Martinez, who did not participate in the conversation with Montañez, corroborated Cruz's memory of having relayed Montañez's consent to her fellow officers. (*Id.* at 58:23–59:2.) Such oral consent is sufficient under the Fourth Amendment. *See United States v. Garcia,* 339 F.3d 116, 119–20 (2d Cir.2003); *see also United States v. Buettner–Janusch,* 646 F.2d 759, 764 (2d Cir.1981) ("[I]t is well settled that consent may be inferred from an individual's words, gestures, or conduct. Thus a search may be lawful even if the person giving consent does not recite the talismanic phrase: 'You have my permission to search.'" (citation omitted)).

Because Montañez's oral consent is sufficient to render the search valid under the Fourth Amendment, the Court finds that the search of the Apartment did not violate Defendant's Fourth Amendment rights. Accordingly, the Court need not address the government's alternate theories of consent.

#### B. Statements in the Apartment

Defendant also seeks to suppress the statements he made to police officers in the Apartment following the gun's discovery on the grounds that they were elicited in violation of his *Miranda* rights and were involuntary. (Def. Supp. Mem. 10–11.) Specifically, Defendant argues that by the time he made the statements, he was already in custody for purposes of the Fifth Amendment and thus should have been advised of his rights. (Def. Mem. 5–6.) He also argues that, regardless of whether he was in custody, Martinez's threat to arrest Montañez and Defendant's

aunt in connection with the illegal gun coerced Defendant into confessing his ownership of the gun. (Def. Supp. Mem. 10–13.) The Court will address each argument in turn.

### 1. Custody

 Under the Fifth Amendment, "[a]n interaction between law enforcement officials and an individual generally triggers *Miranda's* prophylactic warnings when the interaction becomes a 'custodial interrogation.'" *United States v. FNU LNU*, 653 F.3d 144, 148 (2d Cir.2011). As the term itself suggests, a "custodial interrogation" exists when two elements are present: (1) an interrogation of a defendant (2) who is in custody. *See id.* Here, there is no dispute that Martinez was interrogating Defendant about the gun when Defendant made the self-incriminating statement in the Apartment. *See id.* (noting that an interrogation "consists of 'express questioning or its functional equivalent'" (quoting *Rhode Island v. Innis*, 446 U.S. 291, 300–01, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980))). Thus, the only question is whether Defendant was in custody at that time.

 To determine whether a suspect was in custody, courts apply a three-part test that asks:

(1) what were the circumstances surrounding the interrogation; (2) would a reasonable person [in those circumstances] have felt he or she was not at liberty to terminate the interrogation and leave; and (3) if not, whether [the defendant's] freedom of action ha[d] been curtailed to a degree associated with [a] formal arrest.

*United States v. Akapo*, 420 Fed.Appx. 42, 44 (2d Cir.2011) (citations and internal quotation marks omitted); *see Yarborough v. Alvarado*, 541 U.S. 652, 663, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004); *FNU LNU*, 653 F.3d at 153 ("[T]he overarching 'custo-

dy' question is whether a reasonable [person] in the suspect's position would have understood [him]self to be subjected to restraints comparable to those associated with a formal arrest." (internal quotation marks omitted)). Relevant circumstances include:

the interrogation's duration; its location (e.g., at the suspect's home, in public, in a police station, or at the border); whether the suspect volunteered for the interview; whether the officers used restraints; whether weapons were present and especially whether they were drawn; whether officers told the suspect he was free to leave or under suspicion.

*FNU LNU*, 653 F.3d at 153. The nature of the questions asked is also relevant. *Id.* Thus, although formal arrest provides the benchmark for determining custody, a suspect may be in custody for *Miranda* purposes without actually having been formally arrested.

Here, several relevant facts are not in dispute. First, the interrogation occurred in Defendant's home. *See United States v. Newton*, 369 F.3d 659, 675 (2d Cir.2004) (noting that interrogation in the "familiar surroundings of one's own home is generally not deemed custodial"). Second, it appears to have been of relatively brief duration. And third, the officers did not raise their voices, draw their weapons, or use handcuffs or other restraints. (Tr. at 32:18–34:3, 61:11–62:11.)

Nevertheless, the Court doubts that a reasonable person in Defendant's position would have felt free to terminate the interrogation and leave. By the time he discovered the firearm and asked Defendant about its ownership, Martinez had already made Defendant aware of the outstanding bench warrants for his arrest, and three officers were clustered in Defendant's immediate vicinity. Even though the officers

apparently did not explicitly tell Defendant that they intended to arrest him on the warrants, a reasonable person confronted with two warrants and four armed officers would understand that he was not free to leave.

Furthermore, Martinez's threat to arrest everyone in the Apartment unless Defendant provided information about the gun's ownership made explicit what would have already been obvious to Defendant. A threat to arrest a person who refuses questioning clearly communicates to that person that they are not free to terminate the interrogation and leave. *Cf. FNU LNU*, 653 F.3d at 154 ("[T]he content of [an] officer's questions substantially inform [sic] whether a reasonable person would feel restrained in a way similar to a formal arrest.") Put another way, it communicates to the suspect that their default state is arrest rather than liberty. Thus, in light of the totality of the circumstances of Defendant's questioning—including Martinez's threat, the two bench warrants, the presence of four officers, and the clustering of three of those officers around Defendant—the Court finds that a reasonable person in Defendant's position would have felt restrained to a degree associated with formal arrest.[6]

### 2. Voluntariness of Defendant's Confession

▆ Defendant also argues that Martinez's threat to arrest Montañez and Defendant's elderly aunt improperly coerced Defendant into confessing that he owned the firearm. A confession is involuntary, and therefore inadmissible, if it is obtained by "techniques and methods offensive to

due process, or under circumstances in which the suspect clearly had no opportunity to exercise 'a free and unconstrained will.'" *Oregon v. Elstad*, 470 U.S. 298, 304, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985) (citation and internal quotation marks omitted). As with determining whether a defendant was in custody, the inquiry into voluntariness is objective. It asks whether, based on the totality of circumstances, "the government agents' conduct 'was such as to overbear [a defendant's] will to resist and bring about confessions not freely self-determined.'" *United States v. Kaba*, 999 F.2d 47, 51 (2d Cir.1993) (quoting *United States v. Guarno*, 819 F.2d 28, 30 (2d Cir.1987)). Factors relevant to this determination include "the type and length of questioning, the defendant's physical and mental capabilities, and the government's method of interrogation." *United States v. Okwumabua*, 828 F.2d 950, 953 (2d Cir. 1987); *see Deskovic v. City of Peekskill*, 894 F.Supp.2d 443, 457–58 (S.D.N.Y.2012). The government must prove that a confession is voluntary by a preponderance of the evidence. *Colorado v. Connelly*, 479 U.S. 157, 168, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986).

The Second Circuit has never squarely addressed whether a threat to arrest a suspect's family member renders that suspect's confession involuntary. Several other circuits, as well as several district courts in this circuit, have considered this question, however, and have all reached a similar conclusion: such a threat does not render a confession involuntary *if* the police have probable cause to arrest the family member and thus could lawfully carry out the threat. *See, e.g., United States v.*

---

**6.** Defendant moved to suppress only his statements subsequent to the firearm's discovery. (*See* Def. Mem. 6.) Accordingly, the Court does not reach whether Defendant's statement identifying the closet where the firearm was found as his should be suppressed. (*See*

Tr. at 59:5–6.) However, the Court notes that there is no testimony to suggest that this statement was elicited in response to interrogation or was anything other than a spontaneous and voluntary utterance.

*Johnson*, 351 F.3d 254, 257, 260–61, 263 (6th Cir.2003) (finding that a threat to arrest a suspect's sister was not coercive because the police had probable cause to arrest the sister); *Thompson v. Haley*, 255 F.3d 1292, 1296–97 (11th Cir.2001) (holding that a threat to arrest a suspect's significant other did not render the suspect's murder confession involuntary where the police had probable cause to arrest the significant other); *Allen v. McCotter*, 804 F.2d 1362, 1364 (5th Cir.1986) (same); *see also United States v. Ortiz*, 499 F.Supp.2d 224, 232–33 (E.D.N.Y.2007) ("It is not coercive to threaten a suspect's family member with arrest to secure a *Miranda* waiver from the suspect if[ ] there is probable cause to arrest the family member."); *United States v. Memoli*, 333 F.Supp.2d 233, 238 n. 3 (S.D.N.Y.2004) (finding a confession voluntary where the defendant's girlfriend, whom police threatened to arrest, was "liable for arrest for, at the very least, constructive possession of illegal firearms"). Thus, the Sixth Circuit, for example, found a suspect's confession involuntary where the police threatened to arrest his mother and girlfriend despite having no probable cause to do so. *See United States v. Finch*, 998 F.2d 349, 356 (6th Cir.1993); *see also United States v. Bolin*, 514 F.2d 554, 560–61 (7th Cir.1975) (holding, in the Fourth Amendment context, that a defendant's consent to search was not voluntary where the police threatened to arrest his girlfriend despite having no basis for suspecting her of wrongdoing); *United States v. Andrews*, 847 F.Supp.2d 236, 249–50 (D.Mass.2012) (holding that an unfounded threat to arrest a suspect's elderly mother rendered the suspect's confession involuntary).

Notwithstanding the clear thrust of persuasive authority, the government contends that unfounded threats against family members create, at most, a difficult but constitutionally permissible choice for suspects. (*See* Letter from government to Court, dated Feb. 28, 2013, Doc. No. 26 ("Gov't Letter"), at 1–2.) In support of that proposition, the government relies on *United States v. Mullens*, in which the Second Circuit distinguished between choices that are psychologically coerced and those that are "merely difficult." 536 F.2d 997, 1000 (2d Cir.1976). *Mullens* involved a defendant who voluntarily surrendered and confessed to police after finding out from a cousin that police had executed a search warrant on the defendant's home, found counterfeit money there, and arrested the defendant's parents. *Id.* at 998–99. When the search warrant was later ruled invalid, the defendant sought to suppress his confession as involuntary because "his filial affection left him with no choice but to act as he did once he learned that his parents were being detained." *Id.* at 1000. The Second Circuit rejected that argument, noting that the "desire to protect a relative from the rigors of arrest, interrogation and possible confinement" does not, on its own, render a confession involuntary. *Id.* To make a confession involuntary, *Mullens* suggested, there must be some "indication of police overreaching"— a circumstance the court found absent from that case given that the defendant had learned of his parents' arrest from his cousin, not from police, had made a "spontaneous decision" to go to the police and confess, and had "blurted out" his confession "before the police had even begun to interrogate him." *Id.*

Thus, the difficult choice that the defendant in *Mullens* confronted involved circumstances materially different from those in which police explicitly threaten a suspect with the arrest of a family member in order to induce that suspect to confess. Indeed, *Mullens* suggests that such direct threats, made in the context of an interrogation to elicit a confession, constitute pre-

cisely the type of "overreaching" that can push a confession across the line from difficult to involuntary.

Here, as a result of Martinez's threat, Defendant's confession fell on the wrong side of that line. Under the rule followed by courts in this circuit and others, Martinez's threat to arrest Montañez and Defendant's elderly aunt was improper unless the police had probable cause to arrest those individuals and thus could lawfully act on the threat. The government has already conceded that such probable cause was lacking as to Defendant's aunt, so the threat to arrest her clearly was improper. (*See* Tr. of Feb. 26, 2013 Oral Argument at 36:19–24; Gov't Letter at 2 n. 2.) With respect to Montañez, the government argues that because she was the registered tenant of the apartment where the gun was found, the officers had probable cause to arrest her based on a theory of constructive possession. (Gov't Letter at 2.) In support of its position, the government cites four cases for the proposition that primary tenancy is sufficient to establish probable cause for constructive possession of contraband found in a residence. Those cases, however, are distinguishable from the instant matter on either legal or factual grounds. *Krause v. Bennett* involved contraband that was in plain view. 887 F.2d 362, 371 (2d Cir.1989); *see also United States v. Coiscou*, 793 F.Supp.2d 680, 686–87 (S.D.N.Y.2011) (same). *United States v. Morales* involved two firearms in an apartment that an informant had seen on multiple occasions, suggesting that they too were in plain view. 851 F.Supp. 112, 115 (S.D.N.Y.1994). *United States v. Memoli* involved trafficking of multiple firearms out of an apartment. 333 F.Supp.2d at 235. And *Cammick v. City of New York* relied on a state-law presumption that all occupants of a place where a machine-gun is found are in constructive possession of it, which is inapplicable in this

case. *See* No. 96 Civ. 4374(RPP), 1998 WL 796452, at *3 (S.D.N.Y. Nov. 17, 1998). Here, by contrast, the officers discovered the gun inside the breast pocket of a man's coat located in a closed closet that Defendant had told officers housed his possessions. (Tr. at 59:3–14.) In addition, unlike *Memoli*, there is no allegation here that the Apartment was regularly used for criminal activity. Under these facts, a reasonable officer could not have concluded that there was probable cause to arrest Montañez for constructive possession of the gun. Martinez therefore had no basis for threatening to arrest either Montañez or Defendant's aunt, and so his threat to do so was sufficiently overreaching as to warrant suppression of Defendant's self-incriminating statements at the Apartment.

\* \* \*

In sum, the Court suppresses Defendant's self-incriminating statements in the Apartment on two grounds: that they were obtained in violation of *Miranda* and that they were improperly coerced.

### C. Statements at the Precinct

Following his arrest on July 24, Defendant made self-incriminating statements at the NYPD 40th Precinct that he now moves to suppress on two grounds. First, Defendant argues that there was "not a 'sufficient break in the stream of events' following the first compelled confession." (Def. Supp. Mem. 13 (quoting *Elstad*, 470 U.S. at 310, 105 S.Ct. 1285).) Second, he argues that he made the statements after having unambiguously invoked his right to remain silent. (*Id.* at 15–19.) The Court will address each argument in turn.

#### 1. Break in Stream of Events

"When a prior statement is actually coerced, [ (1) ] the time that passes between confessions, [ (2) ] the change in place of interrogations, and [ (3) ] the

change in identity of the interrogators all bear on whether that coercion has carried over into the second confession." *Elstad*, 470 U.S. at 310, 105 S.Ct. 1285; *see also United States v. Anderson*, 929 F.2d 96, 102 (2d Cir.1991) (finding that the taint from an involuntary confession had not dissipated by the time defendant made a second confession because only a short time—the length of a car ride from an arrest site to the DEA office—had passed between the confessions and "the suspect was at all times in custody and under close police supervision with the same agents present on both occasions"); *United States v. Pichardo*, No. 92 Cr. 354(RPP), 1992 WL 249964, at *10 (S.D.N.Y. Sept. 22, 1992) (finding that a prior involuntary statement tainted a second confession where only two-and-a-half hours passed between the confessions, the defendant remained in custody, and the same officer conducted the interrogation). Here, given that his confession at the Apartment was coerced, Defendant contends that each of the three *Elstad* factors favors suppressing his statements at the 40th Precinct. He points to the short time between confessions—Defendant plausibly estimates one hour (Def. Supp. Mem. 14)—and to the fact that he was in custody the entire time under the close supervision of the officers who were present at his arrest, including Martinez, the officer who threatened him and his relatives with arrest (*id.* at 14–15).

Despite some parallels to *Anderson* and *Pichardo*, however, Defendant's case lacks the continuity in the stream of events that supported the finding of taint in those cases. In *Anderson*, the Second Circuit noted that the agent who elicited the second confession "made no effort to dispel the original threat" and, in fact, "reaffirmed [the previous agent's] coercive statements." 929 F.2d at 102. Similarly, in *Pichardo*, the same officer who coerced the first confession also elicited the second

confession and, in between, "made no effort to dispel the misleading nature of his earlier statements." 1992 WL 249964, at *10. Here, by contrast, by the time Defendant made the second confession, Martinez's threat had clearly abated. Defendant had already satisfied the condition that would allow his mother and aunt to escape arrest and had no further reason to fear for them. Martinez never renewed the threat and, at the precinct, adopted a rather solicitous demeanor towards Defendant, affirming his right to remain silent, offering him food, water, and medical attention, and even wishing him well. (*Id.* at 63:24–64:7.) Thus, in both word and deed, Martinez "dispel[led] the original threat" that Defendant would face undesirable consequences by remaining silent. *Anderson*, 929 F.2d at 102.

Defendant nevertheless argues that his confession at the precinct reflected ongoing concern for his mother's wellbeing. Specifically, he cites Cruz's recollection that, in response to hearing that ECT was on its way, Defendant said that the "gun in the closet in the jacket belonged to him and that he didn't want his mother to know. She had no knowledge of this gun being in the [A]partment." (Tr. at 36:25–37:2.) In fact, however, Defendant had expressed a similar concern to Cruz at the Apartment, where, unprompted by any question, he asked her "not to let his mother know that there was a firearm" there. (*Id.* at 30:19–31:7.) Taken together, these statements reflect a continuing desire to conceal the gun's discovery from his mother, rather than an expression of ongoing concern that his mother would be arrested in connection with the firearm.

Accordingly, the Court finds that Defendant's second confession was untainted by the coercion that elicited his first.

## 2. Right to Silence

As an alternative to his argument that the first confession tainted the second, Defendant argues that the second confession was obtained in violation of his right to silence. (Def. Supp. Mem. 15.) It is well-established that once a defendant invokes the right to silence, that right must be "scrupulously honored," *Michigan v. Mosley*, 423 U.S. 96, 104, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975), and fresh questioning cannot resume unless "there is a reasonable basis for inferring that the suspect has voluntarily changed his mind." *United States v. Collins*, 462 F.2d 792, 802 (2d Cir.1972). Here, there is no dispute that Defendant unambiguously invoked his right to silence soon after arriving at the precinct and some time before he made the statements. (*See* Tr. at 63:20–23.) Moreover, the government does not claim Defendant voluntarily changed his mind, and, in any event, there is no evidence that he did. Thus, it is clear that Rosario's subsequent interrogation of Defendant was improper. Notwithstanding that impropriety, however, the government argues that Defendant's statement is admissible under an exception in *Miranda* for volunteered statements. *See Miranda v. Arizona*, 384 U.S. 436, 478, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *see also United States v. Oehne*, 698 F.3d 119, 124 (2d Cir.2012) (finding a waiver of Fifth Amendment right where the defendant "spontaneously" and "voluntarily" discussed his offense conduct with officers).

Specifically, the government argues that because Defendant's statements were a "voluntary and spontaneous" reaction to overhearing Martinez tell Cruz that ECT was on its way, they are admissible under *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). (Gov't Supp. Mem. 9.) In that case, the Supreme Court held that a conversation between two officers in front of a defendant that "struck a responsive chord" in the defendant was not an interrogation for *Miranda* purposes unless "[the] suspect's incriminating response was the product of words or actions on the part of the police that they should have known were reasonably likely to elicit an incriminating response." 446 U.S. at 302, 100 S.Ct. 1682.

Here, the undisputed testimony supports the government's characterization of Defendant's statements as a reaction to overhearing Martinez's comment to Cruz, rather than as a response to Rosario's questioning. (*See* Tr. at 36:21–37:1, 67:5–10.) Martinez's comment was, in all relevant regards, comparable to the conversation deemed permissible in *Innis*. As in that case: Martinez's comment to Cruz clearly "included no express questioning of the [defendant]," 446 U.S. at 302, 100 S.Ct. 1682; nothing in the record suggests that Martinez was aware that Defendant knew what "ECT" stood for, let alone that ECT engaged in such forensic techniques as fingerprinting, *id.;* nor is this "a case where the police carried on a lengthy harangue in the presence of the suspect" or made particularly "evocative" comments, *id.* at 303, 100 S.Ct. 1682. Rather, Martinez's entire conversation with Cruz "consisted of no more than a few off hand remarks" meant to convey mundane scheduling information to Cruz. *Id.* On this basis, the Court finds nothing in the record to support the conclusion that Martinez should have known that his comment would provoke a response from Defendant. *Cf. Acosta v. Artuz*, 575 F.3d 177, 191–92 (2d Cir.2009) (approving decisions in other circuits rejecting the proposition that " 'statements by law enforcement officials to a suspect regarding the nature of the evidence against the suspect constitute interrogation as a matter of law' " (quoting *United States v. Payne*, 954 F.2d 199, 203 (4th Cir.1992))).

Of course, the Court must pause to observe that the instant case is more troubling than *Innis*. Whether voluntary and spontaneous or not, Defendant's self-incriminating statements occurred in the midst of an interrogation by Rosario that unquestionably violated Defendant's right to silence. (*See* Tr. of Feb. 26, 2013 Oral Argument at 45:23–46:3 (statement by the government conceding that Rosario's interrogation violated Defendant's right to silence).) That failure to scrupulously honor Defendant's right to silence raises a question of whether Rosario's interrogation in some way contributed to Defendant's readiness to incriminate himself. (*See id.* at 18:23–19:5 (arguing that Defendant's statements were the result of Rosario's interrogation).) Despite the concerns raised by the NYPD's conduct here, however, the government has sufficiently demonstrated that Defendant's statement was a voluntary and spontaneous utterance. Specifically, the evidence establishes that Defendant's statement clearly was not a response to Rosario's questioning, which concerned a topic entirely unrelated to the gun. (Tr. at 88:9–89:18, 91:10–11.) Rather, Defendant's statement was a reaction to a comment by Martinez directed not at Defendant, or even at Rosario, but at Cruz. Thus, Rosario's questioning, while improper, does not provide grounds for suppressing Defendant's self-incriminating statement at the precinct.

\* \* \*

In sum, the Court finds that Defendant's first, coerced confession did not taint his confession at the Precinct and that the latter confession was a volunteered and spontaneous statement. Accordingly, the Court denies Defendant's motion to suppress his self-incriminating statements at the Precinct.

### D. Statements to Agent Morales

Finally, Defendant moves on Fifth and Sixth Amendment grounds to suppress his statement to ATF Special Agent Morales that he knew the gun was in the Apartment and previously had handled it. (Def. Supp. Mem. 19–21.) Defendant asserts that Morales violated his Fifth Amendment rights by failing generally to properly advise him of his rights and by failing specifically to advise him of his right to have his state attorney present for their conversation. (*Id.*) He also claims that Morales violated his Sixth Amendment right to counsel by questioning him outside the presence of his state attorney. (*Id.*; Def. Mem. 6–8.)

Defendant's argument regarding the sufficiency of Agent Morales's *Miranda* warnings is more a factual claim than a legal one, and based on the evidence before it, the Court finds that Agent Morales read Defendant his *Miranda* rights. Her testimony to that effect was credible and undisputed, and given her nine years as a federal agent, there is no reason to believe that when she said she "Mirandized [Defendant] from a card that [she] keep[s] in [her] wallet," she meant anything less than that she read Defendant his complete *Miranda* rights. (*See* Tr. at 106:9–107:3; *see also* Ortiz Aff. ¶¶ 10–12 (offering Defendant's account of his arrest by Agent Morales without any allegation that Agent Morales failed to fully Mirandize him).)

Defendant also argues that Agent Morales violated his *Miranda* rights by telling him that "if he wanted to talk to [her], it was up to him" (Tr. at 108:7) and then engaging Defendant in a conversation that was the "functional equivalent of interrogation" (Def. Supp. Mem. 20 (citing *Innis*, 446 U.S. at 301, 100 S.Ct. 1682)). In support of this position, Defendant relies mainly on *United States v. Plugh*, in which the Second Circuit suppressed self-incrimi-

nating statements that the defendant made after federal agents told him that they would relay his cooperation to the prosecutor and that "[i]f he wanted to make any statements this was the point." 576 F.3d 135, 138, 144–45 (2d Cir.2009), *rev'd on reconsideration on other grounds*, 648 F.3d 118 (2d Cir.2011). *Plugh*, however, is inapposite. The court in *Plugh* reached its holding only after first finding that the defendant had unambiguously invoked his rights to silence and counsel before the agents attempted to induce his cooperation. *See* 576 F.3d at 142–44.[7] Here, by contrast, there is no evidence that Defendant invoked either his right to silence or to counsel before Agent Morales told him that he was free to talk to her. Moreover, unlike the statements at issue in *Plugh*, which were clearly meant to pressure the defendant to waive his right to silence by offering a reward for cooperation, Agent Morales's comments simply offered Defendant the option of speaking to her without any promise of reward or punishment. Accordingly, the Court finds that Agent Morales did not obtain Defendant's self-incriminating statements in violation of his rights under the Fifth Amendment.

▮▮▮ Defendant's argument that Agent Morales violated his Sixth Amendment right to counsel by speaking to him about the gun outside the presence of his state attorney fares no better. (Def. Mem. 7–8; Def. Supp. Mem. 20.) Although the Sixth Amendment right to counsel *may* continue uninterrupted from a state charge to a federal indictment if both prosecutions are for the same offense, *see United States v. Moore*, 670 F.3d 222, 235 (2d Cir.2012) (citing *Texas v. Cobb*, 532 U.S. 162, 173, 121 S.Ct. 1335, 149 L.Ed.2d

321 (2001)), the law is clear that "any Sixth Amendment rights related to [pending] state offenses would not serve to restrict [an] ongoing investigation into *uncharged* federal crimes." *United States v. Worjloh*, 546 F.3d 104, 108 (2d Cir.2008) (emphasis added); *see also id.* at 109 (holding that "the pending state prosecution against [the defendant] had no Sixth Amendment effect on the questioning related to uncharged federal conduct"). Here, when Defendant spoke with Agent Morales on September 17, 2012, he was in federal custody pursuant only to a criminal complaint. (Doc. No. 1.) The Second Circuit has unequivocally stated that arrest does not trigger the Sixth Amendment right to counsel. *See Moore*, 670 F.3d at 234 (noting that "[a]bsent a formal charge, arrest on a warrant, even one issued pursuant to a criminal complaint sworn out by prosecutors, is insufficient prior to the initial appearance before a judicial officer" to trigger the right to counsel).

Defendant nevertheless argues that under *United States v. Mills*, 412 F.3d 325 (2d Cir.2005), his right to counsel in the state proceeding carried over uninterrupted to the federal investigation. (Def. Mem. 7–8.) In *Mills*, the Second Circuit held that when state or local officials obtain statements in violation of a defendant's Sixth Amendment rights, those statements are inadmissible in a subsequent federal prosecution. See 412 F.3d at 330. The Circuit underscored the narrowness of *Mills'* holding several years later, in *United States v. Worjloh*, describing *Mills* as "limited to situations in which federal prosecutors seek to admit evidence obtained by state and local prosecutors in violation of the Sixth Amend-

---

7. On reconsideration, the Second Circuit reversed its finding that the defendant in *Plugh* had unambiguously invoked his rights to silence and to counsel. Nevertheless, that re-

versal did not cast doubt on the validity of the conclusion that if the defendant had unambiguously invoked those rights, the agents' statements would have been improper.

ment." 546 F.3d at 109. Clearly, that is not the situation here. As in *Worjloh,* federal prosecutors here do "not seek to offer any evidence obtained by state officials in violation of the Sixth Amendment. Instead, they [seek] only to introduce statements made in the course of the federal interrogation, an interrogation that was unquestionably independent of the state arrest and investigation." *Id.* at 108.[8] Thus, *Worjloh,* rather than *Mills,* governs the instant case and dictates the conclusion that Defendant's motion to suppress his statements to Morales on Sixth Amendment grounds must fail.

### IV. CONCLUSION

For the foregoing reasons, the Court grants Defendant's suppression motion in part and denies it in part. Specifically, the Court grants Defendant's motion to suppress statements he made in the Apartment on July 24, 2012, and it denies Defendant's motion as to the remaining categories of challenged evidence. In light of this opinion, IT IS HEREBY ORDERED THAT the parties shall appear for a status conference on Monday, May 13, 2013 at 3:00 p.m. to discuss next steps in this action. The conference will take place in Courtroom 905 of the United States Courthouse at 40 Centre Street, New York, New York.

The Clerk of the Court is respectfully directed to terminate the motion pending at Doc. No. 13.

SO ORDERED.

---

8. For that reason, the instant case also does not trigger the same policy concerns that animated Mills. Mills sought to prevent a specific type of abusive situation wherein state officers would obtain evidence in violation of defendants' Sixth Amendment rights and then hand off the cases to federal officials for prosecution in order to circumvent suppression motions See *Worjloh,* 546 F.3d at 109. There is no allegation of such an end-run here, for Defendant alleges no Sixth Amendment violations by state law enforcement officers.